166 So. 782

### ALABAMA FUEL & IRON CO. v. POWASKI.

#### 6 Div. 759.

Supreme Court of Alabama.

March 26, 1936.

Benners, Burr, McKamy & Forman, of
Birmingham, for appellant.

[redacted]

Hugh A. Locke and Andrew W. Griffin, both of Birmingham, for appellee.

[redacted]

GARDNER, Justice.

Plaintiff recovered a judgment against defendant for assault and battery, from which this appeal is prosecuted.

Touching the merits of the case, defendant vigorously insists that, if plaintiff was assaulted by any of its employees, it was without the line and scope of their employment, and could be attributed solely to gratification of personal resentment or malice, and that the affirmative charge, as requested, was its due.

[redacted] The applicable rule is well understood. Responsibility of the master for acts of the servant does not arise simply from the circumstance that at the time of the injury the person inflicting it was in the employment of another. The act inflicting the injury must have been done in pursuance of authority, either express or implied. "That is, it must be an act which is fairly incident to the employment, in other words, an act which the master has set in motion." Goodloe v. Memphis, etc., R. R. Co., 107 Ala. 233, 18 So. 166, 167, 29 L.R.A. 729, 54 Am.St.Rep. 67. The master is of course exempt from "liability when the servant or agent steps aside from the scope of his employment and commits a tort for his own personal gratification, and in no manner connected with the accomplishment of the object of his employment." Supreme Lodge Loyal Order of Moose v. Kenny, 198 Ala. 332, 73 So. 519, 524, L.R.A.1917C, 469.

The cases noted by defendant (among them, Wells v. Henderson Land & Lumber Co., 200 Ala. 262, 76 So. 28, L.R.A.1918A, 115; Johnson v. Alabama Fuel & Iron Co., 166 Ala. 534, 52 So. 312, 313; Buttrey v. Wilhite, 208 Ala. 573, 94 So. 585; Hardeman v. Williams, 150 Ala. 415, 43 So. 726, 10 L.R.A.(N.S.) 653; Republic Iron & Steel Co. v. Self, 192 Ala. 403, 68 So. 328, L.R.A.1915F, 516), furnish apt illustrations.

The facts of each particular case must determine. Goodloe v. Memphis & Charleston R. R. Co., supra; St. Louis-San Francisco R. Co. v. Robbins, 219 Ala. 627, 123 So. 12.

The rule was restated in the recent case of Gulf Refining Co. v. McNeel, 228 Ala. 302, 153 So. 231, 234, wherein the following was approvingly quoted from Rochester-Hall Drug Co. v. Bowden, 218 Ala. 242, 118 So. 674: "If an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment. Gulf, M. & N. R. Co. v. Havard, 217 Ala. 639, 117 So. 223; National Life & Accident Ins. Co. v. Cruso, 216 Ala. 421, 113 So. 396; 39 Corpus Juris 1283. Such conduct, to come within the rule, must not be impelled by motives that are wholly personal, or to gratify his own feelings or resentment, but should be in promotion of the business of his employment. Republic Iron & Steel Co. v. Self, 192 Ala. 403, 68 So. 328, L.R. A. 1915F, 516. If the conduct was 'committed in the accomplishment of objects within the line of his duties, or in and about the business or duties assigned to him by his employer,' the master is responsible. Palos Coal & Coke Co. v. Benson, 145 Ala. 664, 39 So. 727."

[redacted] In the instant case, on the facts, we are persuaded a jury question was presented. On the night (about 8 p. m.) of November 4, 1933, some houses in defend-

ant's camp at the Acmar Mines, occupied by the negro employees (referred to as Negro Hill), was fired into by unknown parties; the electric lights being first extinguished. There was much excitement among the 300 or more negroes occupying these houses, and Shepherd, superintendent of the Acmar Mine, temporarily absent at the time, being notified, hastened to the camp. Armed with one of the submachine guns kept on the premises, Shepherd, in company with Luke Ginright, a company deputy, and others employed by defendant, including the mine foreman, started out in search of those guilty of this offense. After making a survey of the situation on "Negro Hill," the searching party, consisting of some twelve or fifteen men in all, and in three cars, traveled down a certain road, and some one and a half or two miles from the scene of the trouble found plaintiff and two others, who had formerly worked for defendant, though not then employed, walking down the road, each with a shotgun. These three were taken into the car and driven to defendant's office, being first relieved of their guns. This was about 10 o'clock that night. Those participating in the search remained around the office, where, in the meanwhile, Bell, defendant's general manager, had arrived. Empty shells found on Negro Hill were brought to the office and compared by Bell with those in the guns of plaintiff and his companions, and Bell also examined their guns, ascertaining they had been freshly fired. Plaintiff and his companions, in the course of time, were taken into the office and questioned.

It is clear that both Shepherd and Bell were well convinced they had the guilty parties, but they considered sufficient proof was then lacking to sustain their conviction or justify further detention. Bell testified: "I told them that I did not have any eye witnesses to their being up there, but we were confident that they did so, but we were going to turn them loose and let them go home, but the camp was wrought up; colored and white people were excited, everybody stirring around, and I would advise them not to take any short cuts, or to go around any of the houses because everybody was then guarding their house and just keep in the middle of the road and go on home. * * * They wanted to know about the guns * * * and I told him I would keep those guns until we would see what we would do about it." Bell further states that he did not leave the office until

some five minutes after plaintiff and his two companions had left, did not see the direction they went, and knew nothing of anything further in connection with any assault until learning of it later.

Prior to this conversation in the office, Bell had also been around in the camp on inspection regarding the trouble, armed with a submachine gun, and a larger portion of the fifteen or twenty men gathered at the office were armed, most, if not all, being of defendant's white employees.

A sharp conflict in the proof here appears. Plaintiff's evidence is to the effect that Bell told them to go down the railroad, and that he was going to put a man behind them to see they went down the railroad. Before leaving the office (about midnight), plaintiff says he was again searched for weapons, and the three then proceeded towards home down the railroad. When they had gotten about one-half or three-quarters of a mile away from the office, the assault was committed. Plaintiff's proof tends to connect several of those at the office with the assault, including Shepherd, present with his submachine gun, aiding and giving encouragement thereto. This Shepherd and the others deny, insisting they went from the office to their homes, knew nothing of such an assault, and of course had no participation therein.

Among the white assailants were some negroes, but their identity is not disclosed, with the exception, possibly, of one negro employee. Whether any of them were from the vicinity of "Negro Hill" is purely a matter of conjecture.

Defendant operates more than one mine. This trouble was at the Acmar Mine, where Shepherd was in charge as superintendent. Bell was defendant's general manager, and had come that night from another mine at Overton, where he was stationed, in answer to the call from Acmar.

We are clear to the view that, in the investigation of this crime and the effort to apprehend the guilty parties, the jury could very reasonably infer that Bell, the general manager, and Shepherd, the superintendent, were acting in the line and scope of their authority. They were on company business, intent on the protection of the company's property and employees, and to preserve order in the camp. It may well be inferred that no matter of mere personal resentment or malice motivated these officials; that these employees had in mind the protection of the property and the or-

derly procedure of the company's business, and to this end the apprehension of the guilty parties, and perhaps, also, their punishment to prevent a recurrence of such a crime committed against the company's property and its employees. Quite a different situation from that presented in Wells v. Henderson Land & Lumber Co., and Johnson v. Alabama Fuel & Iron Co., supra, upon which defendant places chief reliance. Illustrative of the distinction is the following sentence, taken from the Johnson Case, supra, wherein the court was speaking of Adams, the general manager of defendant's coal mine, and who first confined and afterwards shot and killed plaintiff's intestate: "When he steps wholly aside from his authority, and does an act to gratify personal malignity, or to accomplish another purpose personal to himself and having *no relation* to the business of the corporation, *as, for aught appearing to the contrary, was the case here,* the corporate master is no longer responsible." (Italics supplied.)

But defendant insists that, conceding for the sake of argument only the correctness of this conclusion, yet the evidence would not justify its extension beyond the time plaintiff was detained at its office, and that as the assault occurred thereafter, off the premises of defendant, and at an hour when the mines were not in operation, there could be no liablity, as any such employees so engaged would then be acting without the line and scope of their authority.

The argument is forcefully and plausibly presented. But we think it overlooks some reasonable inferences to be drawn from the proof, as above indicated. Plaintiff's proof not only tends to show Shepherd's presence, giving encouragement to the assault, as well as the presence of several of those left standing around the office as these three (plaintiff and his two companions) proceeded down the railroad, but the further fact that they went the path pointed out by Bell, the manager, who not only so directed them to go that way, but stated he would send a man after them to see they obeyed the instructions. And the evidence has a tendency also to show that the superintendent Shepherd, Bell, the general manager, Ginright, the special deputy, and those employees gathered around the office, were the only men who were then aware of the fact that plaintiff and his companions had left the office to go home along the railroad track.

In short, we are persuaded the jury might reasonably infer from all the proof that those in authority, convinced of the guilt of plaintiff and his companions, though without sufficient proof to convict would turn them loose with intention to inflict punishment when they were safely off defendant's property, and that the assault followed as a result of such an understanding had at the office when plaintiff left.

Even though it be conceded this may have been an abuse of authority on the part of the superintendent and general manager, yet, if they were nevertheless acting within the line and scope of their authority, as above indicated, liability of defendant would still be made to appear. As noted in Gulf Refining Co. v. McNeel, supra: "If the act was such as was incident to the performance of the duties intrusted to him by the master, the master cannot escape liability because of the abuse of authority."

We are convinced the case was one for the jury and that the affirmative charge for defendant was properly refused.

We are aware that plaintiff's case rested largely upon his own testimony and that of his companion Perkins, salient features of which are in sharp conflict with witnesses for defendant, greater in number, and whose testimony, though employees of defendant, is to be given due weight. But the trial judge saw and heard all of these witnesses, and upon due deliberation the conclusion is reached that the case is not one calling for disturbance of his ruling in denial of the motion for a new trial because the verdict was contrary to the great preponderance of the proof.

What occurred on "Negro Hill" was admissible as lending color to that which followed and tending to show motive as well as by way of explanation of plaintiff's detention in the first place. But it was incidental and only collaterally involved in this trial. Much of the details of the occurrence were admitted and certainly sufficient for all purposes of this trial. The insistence that any further details should have been admitted is without merit, and needs no further discussion. And the affidavits of Eagan, Bowman, and Braden, relating to this collateral matter, offered on motion for new trial, were rejected without error. Nor was there error in the exclusion of proof as to what occurred at the washer plant on November 1st, previous.

In response to objections interposed to the remark of counsel for plaintiff **in**

closing argument, referring to the use of submachine gun, the court, though overruling the objection, instructed the jury that as to any matter of law involved in the case they were bound by what the court gave to them and not that of counsel. In this we find no error to reverse.

The actual trial of the case, disclosed by the bill of exceptions, gives no indication of any matter of bias or prejudice arising from any labor dispute or differences as to labor organizations. Only one fact appears, that plaintiff and his companions formerly worked for defendant, but were not so employed at the time of this trouble.

Counsel for defendant, however, at the inception of the trial, and before the jurors were brought into the courtroom stated to the court that a preliminary question concerning the qualification of jurors was involved; that the circumstances of the alleged assault grew out of a union difficulty, and a number of former employees of defendant with others had organized a local union of United Mine Workers of America, and disorder and trouble had arisen between members of this union and defendant's employees who were not so affiliated, but belonged to what is known as the company union; that, while no labor organization was here directly involved in this trial, yet the insistence was that, by reason of the feeling thus generated, no juror who was a member of the union would be competent and should be challenged for cause.

■■ Our decisions recognized the rule that the disqualifications of jurors mentioned in the statute (section 8610, Code 1923) are not the only ones that exist, but that others existing at common law will be observed as to their competency, and any other ground which indicates probable prejudice will disqualify. Mutual Bldg. & Loan Ass'n v. Watson, 226 Ala. 526, 147 So. 817; Citizens' Light, Heat & Power Co. v. Lee, 182 Ala. 561, 62 So. 199. Additional right of inquiry to ascertain any matter of interest or bias that might affect the case is provided by section 8662, Code 1923.

The trial judge, in response to suggestion of counsel, as noted above, made inquiry of the jurors as to their union affiliation, if any. Some of the jurors answered as to their affiliation, among them juror Russell, a member of the United Mine Workers of America. It is insisted there was error in the refusal of the court to allow defendant to strike the juror for cause. The juror responded to inquiry from the court to the effect that he could render a fair trial and verdict notwithstanding such affiliation, and in effect that he had no feeling of prejudice of any kind against defendant.

As previously stated, no union was interested in the result of this case. Any question of such affiliation was merely incidental, and, indeed, found no reference or comment in the actual trial. There is, of course, no pretense that any statutory ground of challenge for cause existed.

The question as to common-law grounds for such challenge was discussed in Brown v. Woolverton, 219 Ala. 112, 121 So. 404, 406, 64 A.L.R. 640, where it was observed:

"To justify a challenge for principal cause there must be a statutory ground, or some matter which imports absolute bias or favor, and leaves nothing for the discretion of the court. 16 R.C.L. 255. 'Competency under a statute (or for principal cause at common law) is a question of law, but in other cases is a question of fact, or a mixed question of law and fact, to be determined by the trial court in the exercise of a sound discretion, and its decision will not be interfered with, unless clearly shown to have been abused.' 35 C.J. 312.

"A challenge for favor or bias is to be determined by the trial court as any other question of fact, tried without a jury, and is reviewable on like principles. 35 Corpus Juris 312, 403, 404; 16 R.C.L. 279, 282, 288; Calhoun v. Hannan, 87 Ala. 277, 6 So. 291; Larkin v. Baty, 111 Ala. 303, 307, 18 So. 666. The decision of the trial court on such question founded on oral evidence is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion. 35 Corpus Juris 404, 405; 16 R.C.L. 289."

Further elaboration is unnecessary, as we consider the above-cited authority, in connection with other of our cases (Tucker v. Houston, 216 Ala. 43, 112 So. 360; Peterson v. State, 227 Ala. 361, 150 So. 156; Van Derslice v. Merchants' Bank, 213 Ala. 237, 104 So. 663; Southern Railway Co. v. Gantt, 210 Ala. 383, 98 So. 192; Jones v. State, 181 Ala. 63, 61 So. 434; Godau v. State, 179 Ala. 27, 60 So. 908; Mutual Building & Loan Ass'n v. Watson, supra), sufficient to demonstrate this action of the court presents no error to reverse.

■ But it is strenuously insisted that the affidavits of Pratt and Buzbee, offered by defendant on motion for new trial, show that the verdict was based upon passion and

prejudice, and should of consequence be set aside. These affidavits (rejected by the court) relate to occurrences in the jury room during the jury's deliberation in the case. And by an unbroken line of decisions this court has steadfastly adhered to the rule that the verdict of the jury may not be impeached by proof as to such deliberations Our latest expression upon the subject is to be found in Gulf States Steel Co. v. Law, 224 Ala. 667, 671, 141 So. 641, 645, where the underlying principle for the rule is stated in the following language: "The court committed no error, when it declined to consider the affidavit of one of the jurors trying the case, who undertook to testify to his own and fellow jurors' action and conduct while considering the case. A due regard for the proper and orderly administration of the law, a proper regard for the solemnity of verdicts of jurors, as well as a sound public policy forbid that members of a jury, after they have made their deliverances in court, should be allowed to impeach their verdicts. To give consideration to such affidavits would tend to bring the law and its administration into disrepute."

The following cases are to like effect: Bank of Cottonwood v. Hood, 227 Ala. 237, 149 So. 676; Continental Casualty Co. v. Ogburn, 186 Ala. 398, 64 So. 619; Birmingham R., Light & Power Co. v. Moore, 148 Ala. 115, 42 So. 1024, 1030; Hall v. State, 134 Ala. 90, 32 So. 750. "These decisions are rested upon the principle that the law and public policy alike declare that affidavits of jurors with respect to occurrences in the jury room amongst themselves may not be received for the purpose of impeaching their verdict." Birmingham R., Light & Power Co. v. Moore, supra.

There may be for such purpose proof of extraneous facts, as illustrated by the case of Alabama Fuel & Iron Co. v. Rice, 187 Ala. 458, 65 So. 402.

But the affidavits here offered were not of extraneous facts, but concerned the debates and discussions of the case by the jury while deliberating thereon. They are therefore directly within the influence of the authorities herein noted.

Counsel for defendant, fully recognizing the established rule of these authorities, insists that the affidavits were not offered by way of impeachment of the jury's verdict, but to show that some of the jurors fraudulently became members of the jury panel by knowingly and willfully concealing their labor affiliations when the jurors were being qualified for service. Much reliance is had upon Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 469, 77 L.Ed. 993, and Williams v. Bridges, 140 Cal.App. 537, 35 P. (2d) 407, with particular stress upon Clark v. United States, supra.

It appears that, when questioned on their voir dire examination as to any affiliations with any labor organization, some of the jurors, whose conduct in the jury room is complained of by the affidavits of Pratt and Buzbee, remained silent—accepted by the court as meaning they had no such affiliations. It is upon this fact and these affidavits as to what occurred in the jury room defendant relies to sustain its contention in this regard.

The opinion in the Clark Case, supra, fully recognizes the force of the rule of our decisions excluding proof of occurrences in the jury room, as noted by the following expression: "Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world. The force of these considerations is not to be gainsaid." But the opinion recognizes as an exception to the rule when the relation of the juror was fraudulently begun or continued, saying: "The privilege takes as its postulate a genuine relation, honestly created and honestly maintained. If that condition is not satisfied, if the relation is merely a sham and a pretense, the juror may not invoke a relation dishonestly assumed as a cover and cloak for the concealment of the truth." With all of this we may express our accord.

The difficulty, however, with defendant lies, not in the principle it seeks to apply, but with the method of attack. There is offered no extraneous fact, and there is nothing upon which to base any false concealment on the part of any juror, save the affidavits relating to the jury room deliberations. Defendant's case is therefore not brought within the rule of the Clark Case, supra, as will be observed from the following expression found therein: "In saying this we do not mean that a mere charge of wrongdoing will avail without more to put the privilege to flight. There must be a showing of prima facie case sufficient to satisfy the judge that the light should be let in. Upon that showing being made, the debaters and ballots in the jury room are admissible as corroborative evidence, supplementing and confirming the case that

would exist without them. Let us assume for illustration a prosecution for bribery. Let us assume that there is evidence, direct or circumstantial, that money has been paid to a juror in consideration of his vote. The argument for the petitioner, if accepted, would bring us to a holding that the case for the people must go to the triers of the facts without proof that the vote has been responsive to the bribe. This is paying too high a price for the assurance to a juror of serenity of mind."

And later on in the opinion this court noted, as to that particular case: "In the record now before us the evidence of guilt is ample, without the happenings in the jury room, to break down the claim of privilege, and thus let in the light."

In Hyman v. Eames et al. (C.C.) 41 F. 676, 678, also cited by defendant, there was evidence of matter of disqualification wholly aside from affidavits as to the occurrences in the jury room, which affidavits were received in corroboration of this extraneous proof. Like observations are applicable to Williams v. Bridges, supra, as the opinion on its face discloses. In Hyman v. Eames, supra, the court, in discussing this question, observed: "Whether a juror can disqualify himself by anything he may say after the trial has begun is extremely doubtful, and therefore it may be said that declarations made during the progress of the trial, or in the jury-room, are not in themselves sufficient proof of incompetency. But where, as in this case, the question is whether a juror, previous to the trial, committed himself to one of the parties, and there is evidence to show that he so declared himself, the testimony of his associates that he made similar declarations during the trial, and in the jury-room, becomes very persuasive, and no sound reason is perceived for rejecting it."

■■ It thus appears that the rule of exclusion of what occurred in the jury room in impeachment of the verdict so long adhered to in our decisions is very generally recognized as correct in principle. And, as to the exception spoken of in the Clark Case, supra, and upon which defendant relies, it is equally clear that the admission of such proof is dependent, first, upon the establishment of a prima facie case, and that "a mere charge of wrongdoing" will not avail. "There must be a showing of a prima facie case sufficient to satisfy the judge that the light should be let in." Upon the establishment of such prima facie case, then the occurrences in the jury room are admissible by way of corroboration. "To drive the privilege away, there must be 'something to give colour to the charge'; there must be 'prima facie evidence that it has some foundation in fact.' * * * When that evidence is supplied, the seal of secrecy is broken." Clark v. United States, supra. There was no pretense of any showing of a prima facie case. There is merely a charge of wrongdoing with no sustaining proof save the forbidden affidavits. This does not meet the requirements of the law, and to admit the affidavits in the instant case would be to strike down the rule so long adhered to in this state, and so well supported by reason and sound policy.

We of course recognize that a jury free of bias or prejudice in a given cause lies at the foundation of a fair and impartial administration of the law. Its importance cannot be overstated. But here, under well-recognized rules, the evidence tending to show any such bias is inadmissible and properly rejected, and the case is to be considered, therefore, without regard thereto. We are of the opinion the court committed no error in rejecting the affidavits.

■ The charges refused to defendant were either subject to criticism or fully covered by the oral charge of the court, and we consider they need no further treatment here.

There is some suggestion in brief to the effect plaintiff received no permanent injury. The trial court, on motion for new trial, concluded the verdict was excessive and reduced the same with consent of plaintiff. We do not read defendant's brief as insisting that as thus reduced there is yet excessiveness, and that question is therefore not here presented.

We have here considered the matters treated in brief as worthy of discussion, with the result that we find no error to reverse.

The judgment will accordingly be here affirmed.

Affirmed.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.