This is an appeal from a judgment for the plaintiffs in a medical malpractice action arising from the failure of the appellant to accurately calculate the delivery date and from what the jury found to be a negligent induction of labor that resulted in the premature birth of the minor plaintiff *Page 1255 
and complications associated therewith. The jury rendered a verdict for the plaintiff father in the amount of $11,002.00 for medical expenses incurred, for the minor plaintiff for pain and suffering in the amount of $50,000.00, and for the plaintiff mother on her claim based on the premature inducement of labor but awarding her damages in the amount of $0.00 (zero).
Sherry Weaver first went to the office of Dr. Raynard Fabianke in Red Bay, Alabama, on March 17, 1983, to obtain his professional services because she suspected that she was pregnant. Mrs. Weaver had been taking Norlestrin, a type of birth control pill. She had taken the last pill on January 27, 1983. Dr. Fabianke told her that he thought she had become pregnant while taking birth control pills. He estimated that she had conceived in December and, accordingly, calculated a delivery date of late September. Mrs. Weaver testified that she did not seek a second opinion, even though she doubted the accuracy of Dr. Fabianke's calculation. Mrs. Weaver's pregnancy apparently progressed normally.
When the baby was past due according to Dr. Fabianke's projected delivery date, induction of labor was scheduled for October 11, 1983. Efforts to induce labor on the 11th failed. On October 12, labor was successfully induced, and plaintiff Casey Weaver was born at 4:30 p.m. He weighed 5 lbs. 9 ozs. and, according to testimony, was premature.
Dr. Fabianke came into Mrs. Weaver's room shortly after delivery and told her that he had miscalculated and that the baby was premature. He said that he was taking the precaution of sending the baby to the intensive care nursery at North Mississippi Medical Center in Tupelo, Mississippi. After arriving in Tupelo, Casey was placed in the care of Dr. William Hilbun, a board certified pediatrician. Dr. Hilbun practices in Tupelo, Mississippi. According to Dr. Hilbun's diagnosis, Casey was premature and was suffering from respiratory distress syndrome. He was admitted to the intensive care nursery and ultimately placed on a respirator on October 13. Casey developed a pneumothorax on October 14 and was treated with a chest tube. He was also treated with antibiotics and a bili light was used to treat jaundice. Casey was discharged on October 29, and X-rays made at that time indicated that his chest was normal.
Dr. Hilbun examined Casey for the last time on October 12, 1984. At that time he determined that in length and weight the child was considerably above normal. He also stated that he did not believe that Casey had any abnormality or defect that was a result of his premature birth. He recommended that Casey be seen regularly, in case his eyes had been damaged by oxygen used in the respirator.
Mrs. Weaver testified that Casey walked at 13 months of age and talked at two years. She further testified that, except for corrective shoes and the need to watch his eyes, Casey was a perfectly normal 2 1/2 year old.
Dr. Marvin Allen Crane testified as an expert for the plaintiff. Dr. Crane was identified as a medical doctor, board certified as an obstetrician-gynecologist (Ob-Gyn) practicing in Philadelphia, Pennsylvania. Dr. Crane testified that he was not familiar with the medical facilities in Red Bay. He also stated that he did not know the standards required of medical doctors certified in family practice. Dr. Crane stated that he was familiar with the standard of care in the "national medical community."
When questioned concerning the diagnosis made by Dr. Fabianke, Dr. Crane testified that the chance of conception while on Norlestrin pills is non-existent. He also testified that it was below the standard of care to diagnose Mrs. Weaver's pregnancy as beginning in December. Dr. Crane advocated the use of ultrasound or sonogram to determine the age of the fetus. He was not aware that these facilities were not available in Red Bay.
Dr. Crane stated that if the lungs are not mature, a premature baby may suffer from respiratory distress syndrome. He was also allowed to testify, over the defendant's objection, that speech problems diagnosed by neuropsychologist Dr. Judith Kaas *Page 1256 
could have been caused by oxygen deprivation at birth and immediately thereafter.
Dr. Kaas, whose deposition was offered by the plaintiffs, has a Ph.D. in psychology and a post-doctoral fellowship in neuropsychology. She practices in Nashville under the name "Comprehensive Clinical Services, Inc." Her practice is limited to testing. Dr. Kaas saw plaintiff Casey Weaver, then 20 months old, on June 26, 1985, for the purpose of a developmental examination. This examination consisted of observations and formal testing of the child and interviews with the parents. According to Dr. Kaas, Casey did "very well," performing at the 22.4 month level. Dr. Kaas stated that Casey Weaver "is clearly not intellectually deficient".
Over the defendant's objection, Dr. Kaas was allowed to testify that "the absence of mental retardation does not rule out the possibility of a specific learning disability," and that "this child is at an extremely high risk for any disability." She could not say with any degree of certainty that there is going to be any specific learning disability in the future.
The defendant offered the testimony of Dr. Richard Vincent Colan, a pediatric neurologist practicing in Montgomery. Dr. Colan examined Casey Weaver on April 29, 1986, in an attempt to evaluate the two-year, six-month-old plaintiff's brain function. After testifying as to the various aspects of his examination, Dr. Colan concluded that Casey was above average for his age. Dr. Colan found no evidence of speech, coordination, or behavioral abnormalities.
When questioned concerning Dr. Kaas's conclusions, Dr. Colan stated that the results of her testing should be turned over to a physician for evaluation. Dr. Colan also stated that prematurity resulting from the induction of labor rather than from spontaneous delivery is less likely to give the child problems. When asked about the effects of a decrease in oxygen to the brain, Dr. Colan testified that a baby can tolerate a 90% decrease in oxygen for several hours before permanent injury is inflicted. Likewise, he said, a 50-60% decrease can be tolerated "perhaps indefinitely." He also stated that there is, however, the possibility of blindness developing in children who receive oxygen after birth.
Dr. Joseph W. Flippen, a board certified Ob/Gyn specialist practicing in Sheffield testified that ultrasound facilities were available in Tuscumbia, and that a radiologist is needed to interpret the results. He also testified to the degree of danger involved in the use of amniocentesis.
Dr. Flippen testified that the date of delivery is determined by adding 9 months and 7 days to the last menstrual period, and that he does not normally make any other effort to determine the correct date. He also testified that birth control pills are about 99% effective in preventing pregnancy.
At the conclusion of the trial of the case, the court granted the plaintiffs' motion for a directed verdict on the defendant's second defense of contributory negligence. The court denied the defendant's motion for a directed verdict as to all the claims. After the jury verdict, the defendant filed and amended a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and plaintiff Sherry Weaver filed a motion for a new trial. Both motions were denied after a hearing held on July 18, 1986.
The appellant argues: 1) The trial court erred in permitting Dr. Kaas to testify as to the medical causation of a possible speech problem; 2) The judgment for the plaintiffs was against the great weight of the evidence; 3) The trial court erred in allowing testimony by the Ob/Gyn specialist from Philadelphia, Pennsylvania, concerning the appropriate standard of care to be applied in pregnancy and delivery practice in Red Bay, Alabama; 4) The trial court erred in refusing to allow the defendant's plea of contributory negligence to go to the jury; and 5) The trial court erred in refusing to grant a new trial after discovery of the failure of a member of the jury to properly respond to a question on voir dire. *Page 1257 
Appellant first argues that it was error for the trial court to permit testimony by Dr. Kaas concerning her opinion as to the possible connection between respiratory distress occurring at birth and the condition of the minor plaintiff as revealed by her evaluation. He cites as authority for his position this Court's decision in Kriewitz v. Savoy Heating AirConditioning Co., 396 So.2d 49 (Ala. 1981), which upheld the lower court's refusal to allow psychologists to testify as to medical causation of the plaintiff's condition. The Court, in affirming, relied on Ala. Code 1975, § 34-26-1, which essentially prohibits practice by psychologists outside their field of expertise.
The question of whether a witness is qualified to render expert testimony is a question traditionally left to the sound discretion of the trial court, and the decision of the trial court will not be disturbed on appeal unless this Court finds that the trial court abused its discretion. Bell v. Hart,516 So.2d 562 (Ala. 1987); Meadows v. Coca-Cola Bottling Co.,392 So.2d 825 (Ala. 1981). Dr. Kaas did not purport to testify as to the standard of care required of Dr. Fabianke. The major portion of her testimony related to the current condition of the minor plaintiff in light of the problems he experienced at birth. It was certainly reasonable for the trial judge to determine that it was within her expertise to testify as to the risks often associated with premature birth and resulting respiratory distress. The fact of the child's premature birth was admitted by the defendant and, therefore, it was not unreasonable for Dr. Kaas to refer to this fact as an "assumption." We cannot find that the trial court abused its discretion in allowing the testimony of the psychologist concerning her evaluation of the minor plaintiff and the possible connection between complications at birth and his present condition and prognosis. Of course, the testimony of the psychologist was not offered to prove the standard of care required of a medical doctor.
Appellant next argues that the trial judge abused his discretion when he denied appellant's motion for a new trial on the grounds that the jury verdict was against the great weight of the evidence. Granting or refusing a motion for new trial rests within the sound discretion of the trial court. The exercise of that discretion carries with it a presumption of correctness and will not be disturbed on appeal unless the record plainly shows that the trial court was in error.Hill v. Cherry, 379 So.2d 590 (Ala. 1980). In addition, jury verdicts are presumed correct, and this presumption is strengthened when the trial court denies a motion for new trial. Finance, Investment Rediscount Co. v. Wells,409 So.2d 1341 (Ala. 1981); Maffett v. Roberts, 388 So.2d 972 (Ala. 1980). To warrant reversal of a denial of a new trial, the preponderance of the evidence must be so decided as to clearly convince this court that the verdict is wrong and unjust. FirstNat. Bank of Dothan v. Rikki Tikki Tavi, Inc., 445 So.2d 889
(Ala. 1984); Myers v. Evans, 287 Ala. 710, 255 So.2d 581
(1971). Fabianke's arguments do not demonstrate any such error in the verdict. Therefore, it was not error for the trial court to enter judgment on the verdict.
Appellant next argues that a family practitioner in Red Bay, Alabama, cannot be held to the standard of care exercised by an Ob/Gyn specialist in Philadelphia, Pennsylvania. Like May v.Moore, 424 So.2d 596 (Ala. 1982), this case does not involve a rural practitioner being criticized for failure to deal with a specialized problem, but, to the contrary, involves simply a failure to properly calculate the delivery date of an expectant mother, undoubtedly a very routine procedure in both the family and Ob/Gyn practice of medicine.
From 1901 until 1980 this Court applied what has been traditionally referred to as the locality rule in a modified, rather than a strict, form. During this time the phrase "same general neighborhood" was interpreted in light of the usual and customary meaning of the words. In 1980, however, the plurality decision in Zills v. Brown, 382 So.2d 528 (Ala. 1980), demonstrated an intention on the part of several of the Justices to adopt a national medical community *Page 1258 
standard in place of the traditional locality interpretation. In Drs. Lane, Bryant, Eubanks Dulaney v. Otts, 412 So.2d 254
(Ala. 1982) the Zills dictum was adopted as the appropriate standard to be applied to specialists in the field of anesthesiology. May v. Moore, supra, extended this standard to the general practitioner. See Note, Locality Rule Abandoned inAlabama and Family Practitioner Held to National MedicalNeighborhood Standard of Care, 14 Cumb.L.Rev. 251 (1984).
The fact that Dr. Crane, who testified as an expert in this case, practices in Philadelphia, Pennsylvania, would not adversely affect his competence to testify as to the standard of care to be applied in the delivery date calculation and induction of labor by physicians in the general or family practice of medicine. Routine pre-natal, labor, and delivery treatment is an area of overlapping expertise between the family and Ob/Gyn medical specialties. As was pointed out inMay, supra, the language "same general neighborhood" refers to the national medical neighborhood of reasonably competent physicians acting in the same or similar circumstances. In this case, Dr. Crane, who testified about Dr. Fabianke's treatment of the mother and child, had adequate knowledge of the standard of care utilized in prenatal and delivery care, so that his opinion of the proper treatment was properly received.
Appellant next maintains that it was error for the trial court to strike his plea of contributory negligence at the conclusion of the trial. He argues that there was at least a scintilla of evidence to support a finding of negligence on the part of Mrs. Weaver. However, any error with respect to Mrs. Weaver's claim was harmless, because the jury did not award her any damages. There was no error in striking the plea with respect to Casey's claim, because an unborn child obviously cannot be guilty of contributory negligence. Nor was there error with respect to Mr. Weaver's claim for the expenses of treating Casey's difficulties due to prematurity, because Mr. Weaver's claim is derivative of Casey's need for these expenses, and any negligence on Mrs. Weaver's part cannot be imputed to defeat the recovery of these damages. SeeBentley v. Lawson, 280 Ala. 220, 191 So.2d 372 (1966).
Appellant's final contention is that the trial court erred by overruling his motion for new trial based upon the failure of a juror to affirmatively respond to the following question asked by the plaintiffs' counsel during voir dire of the venire panel: "Have any of you ever been a victim of medical negligence? That is, where you thought the doctor did something wrong?" When no one responded, he then stated: "I take it none of you have ever filed a claim for medical negligence? If you have, let me know." On motion for new trial, a juror testified that another juror told everyone in the jury room that "when she was expecting, she fell through a rotten porch and it caused her to go into labor that night, and that Dr. Burns almost let her baby die." She then expressed the opinion that the plaintiffs should be given "the moon." According to appellant, this fact could have adversely affected the impartiality of the jury and resulted in prejudice to his case.
We agree that counsel and parties are entitled to true and honest answers from prospective jurors, to enable them to exercise their discretion wisely in the use of peremptory strikes, and that when jurors fail to answer questions correctly, counsel and parties are denied that right.Martin v. Mansell, 357 So.2d 964 (Ala. 1978); Sanders v.Scarvey, 284 Ala. 215, 224 So.2d 247 (1969); Morris v. ZacSmith Stationery Co., 274 Ala. 467, 149 So.2d 810 (1963).
However, neither testimony nor affidavits of jurors are admissible to impeach their verdicts. Alabama Power Co. v.Brooks, 479 So.2d 1169 (Ala. 1985); State v. Steele,374 So.2d 325 (Ala. 1979); Cameron v. Union Hill Baptist Church,350 So.2d 314 (Ala. 1977); Maring-Crawford Motor Co. v. Smith,285 Ala. 477, 233 So.2d 484 (1970); Alabama Fuel Iron Co. v.Powaski, 232 Ala. 66, 166 So. 782 (1936); Gulf States Steel Co.v. Law, 224 Ala. 667, 141 So. 641 (1932). In Cameron *Page 1259 
this Court, quoting from Powaski, supra, stated the principle underlying the rule that the verdict of the jury may not be impeached by proof of its deliberations:
 "A due regard for the proper and orderly administration of the law, a proper regard for the solemnity of verdicts of jurors, as well as a sound public policy forbid that members of a jury, after they have made their deliverances in court, should be allowed to impeach their verdicts. To consider such affidavits would tend to bring the law and its administration into disrepute."
350 So.2d at 318.
An exception to the rule stated above arises when the affidavits tend to show extraneous facts that have influenced the verdict. Whitten v. Allstate Insurance Co., 447 So.2d 655
(Ala. 1984); Weekley v. Horn, 263 Ala. 364, 82 So.2d 341
(1955). In Weekley, the juror's affidavit that was offered to impeach the verdict was held to be inadmissible, because it concerned the jury's deliberations. The Weekley Court found that those deliberations were not extraneous facts. Whitten,supra. In the Weekley case, the Court cited prior opinions holding that affidavits concerning "the debates and discussions of the case by the jury while deliberating thereon" do not fall within the extraneous facts exception to the rule. Weekley,supra, 263 Ala. at 366, 82 So.2d at 343; Alabama Fuel IronCo. v. Powaski, 232 Ala. 66, 166 So. 782, 787 (1936). TheWeekley Court stated the rationale for the above formulation of the rule as follows:
 "To allow the deliberations of juries and the propriety of their discussions to be impeached by affidavits would abrogate the rule rather than create an exception. If the rule were otherwise it would allow and invite a veritable barrage of post trial affidavits, garnered and sought by nonsuccessful litigants in search of reversible error. This is the reason behind the rule which prevents a consideration of such affidavits."
263 Ala. at 367, 82 So.2d at 343.
In this case, the only evidence offered in support of the motion for new trial was the testimony of one juror as to what another juror said in the jury room during deliberations. The juror who allegedly made the statement did not testify. No juror gave any indication that the alleged statement or the presence of the allegedly biased juror had any effect on the verdict. See Whitten, supra. Indeed, the juror's bias, if any, would have been in favor of the mother, and the jury awarded no damages to the mother. There was ample evidence, as outlined above, to support the finding of liability, and the amount of damages awarded was not extraordinarily or disproportionally large. Under the circumstances, the trial court did not abuse its discretion in denying the motion for new trial.
AFFIRMED.
TORBERT, C.J., and MADDOX, BEATTY and HOUSTON, JJ., concur.