[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1171 
Alabama Power Company appeals from a judgment entered on a jury verdict in favor of George Brooks in this action to recover damages for personal injuries. We affirm.
George Brooks filed suit in the Circuit Court of Jefferson County against Alabama Power Company, Inc. (APCo),[1] alleging that it negligently and/or wantonly maintained its electrical power lines and failed to warn him of the resulting danger. The trial court directed a verdict on the wantonness count in favor of APCo, and the issue of negligence was submitted to the jury, which returned a verdict for Brooks in the amount of $452,496.00.[2] The trial court subsequently denied APCo's motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, and it appeals.
On September 25, 1975, Brooks received serious injuries[3]
while on the job, when the mast or "boom" on the mobile drilling rig he was operating came into contact with a 7,200-volt uninsulated power line, which had been installed and maintained by APCo. The contact occurred while he was checking the hydraulic fluid, which was located in a container underneath the boom. At the time he suffered his injuries, he was employed by Mitchell-Neely Mining Company at its Lanco Pit, operating in Tuscaloosa County. The drilling rig which Brooks was operating was a Chicago Pneumatic T650. It consisted of a truck and body supporting an erectable drill boom. This particular rig had been located at the Lanco Pit operation of Mitchell-Neely for several weeks. The company that owned and operated the pit prior to Mitchell-Neely was also in the business of strip mining. Such an operation generally requires the use of drilling rigs of this type.
Two days prior to the date Brooks was injured, bad weather caused the Lanco Pit operation to shut down in the middle of the day, and all of the workers were sent home. At that time, Brooks drove the drilling rig to the shop area and parked it under a dusk-to-dawn light. This light, which was attached to the same utility pole that supported the line eventually contacted, was the only such light located in that area. Brooks parked the drilling rig approximately 15 feet from a gas pump used to fuel the equipment utilized in the mining operation.
On the date of his injury, Brooks arrived at work shortly before 6:00 a.m. It was customary for him to conduct the preshift servicing of the equipment prior to daylight. The boom, which was located on top of the rig, had to be raised to check the hydraulic fluid. Before raising the boom, Brooks backed the rig a short distance *Page 1172 
from the utility pole to avoid striking the light. He then let the truck jacks down to stabilize the rig and began raising the boom. He watched the back of the boom to insure that it did not strike the truck and cause damage to the arms that raised and lowered it. Prior to reaching its fully-extended position, the boom came into contact with the line. The electric current traveled through the boom and operating controls and into Brooks.
Because it was dark when the contact occurred, Brooks could not see the line; however, he knew it was there. He testified at trial that he associated no danger with what he was doing that morning. He had seen the boom in the raised position around that line and had worked on the drill with the boom in the extended position around the line on prior occasions. It was not readily apparent to him that the boom could reach the line which was contacted.
The lines which ran through the shop area were installed by APCo in 1966, to provide electrical service to the AlCo Mining Company, predecessor to Mitchell-Neely. APCo made the decision concerning the positioning of the line in question and had the authority at any time during or subsequent to its installation to heighten, bury, or insulate it. Later that year, APCo received notice that certain types of equipment having access to the shop area necessitated its raising some power lines to provide adequate clearance. An APCo work order indicated that taller utility poles were installed in the area to accommodate certain types of large equipment traveling on a driveway to and from the pit. Although the particular span of lines raised at that time did not contain the line that Brooks eventually contacted, the driveway leading to the pit also provided access to the shop area. Brooks parked the rig in this driveway, which ran through the shop area between the gas pump and the power line in question. A work order dated January 5, 1967, reflects that APCo returned again to the shop area and conducted additional work. Extra lines were added to accommodate additional load requirements necessitated by the use of certain power tools there, such as a lathe, saw, and welder.
APCo first contends that the trial court committed reversible error by not granting its motion for a directed verdict and later refusing its motion for a judgment notwithstanding the verdict. It argues that it had no duty to insulate its lines in the shop area or to take any precautionary measures with respect thereto because it had no notice, actual or constructive, of any activity on, around, or under the subject lines, which would have indicated that persons might come into contact with them. We disagree.
In Bush v. Alabama Power Co., 457 So.2d 350, 353 (Ala. 1984), the Court restated the duty of a power company with regard to the use and location of uninsulated electrical lines:
 "`The duty of an electric company, in conveying a current of high potential, to exercise commensurate care under the circumstances, requires it to insulate its wires, and to use reasonable care to keep the same insulated, wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith. This statement of the rule implies that, in the absence of statute or municipal ordinance, it is not necessary to insulate wires which are so placed that no one could reasonably be expected to come in proximity to them.' Foster v. Alabama Power Company, 395 So.2d 27, 30 (Ala. 1981), citing Curtis on Law of Electricity, § 510. In other words, Alabama Power must either insulate its electrical lines, or locate them in a position where they pose no danger to human life. However, the duty to insulate does not arise absent notice, actual or constructive, that persons may come into contact with the uninsulated wires. Alabama Power Company v. Alexander, 370 So.2d 252
(Ala. 1979)."
See also Alabama Power Company v. Smith, 273 Ala. 509,142 So.2d 228 (1962), and Alabama Power Co. v. Irwin, 260 Ala. 673,72 So.2d 300 (1954). *Page 1173 
William Dow, an APCo engineer, testified as follows:
 "Q. We have seen the three work orders. If Alabama Power Company's procedures were followed, didn't the procedures call for pole inspections to be made every six or seven years?
". . .
"A. Yes, sir, our procedure calls for it.
 "Q. All right. So, if the line was put in in '66 or '67, that means if Alabama Power Company's procedures were followed, that there would have been at least one more occasion when Alabama Power Company's representative went out there in '74 or '75; correct?
"A. Yes, sir.
". . .
 "Q. If the procedure had been followed, there would have been at least one occasion, one more occasion shortly before George was injured, when there would have been an inspection out there by another Alabama Power Company employee; correct?
"A. Yes, sir.
 "Q. All right. Now, didn't the engineering aide, when they did these pole inspections, also have the responsibility to check the lines and report if they were too low for the conditions?
 "A. Yes. They looked at the poles, the lines, all of our facilities.
 "Q. All right. And in doing that, they have to determine if they are high enough under the conditions present out there?
"A. Yes, sir.
 "Q. This wire on this pole that George got into was a bare uninsulated wire? I'm talking about physical insulation, carrying 7,200 volts; is that correct?
"A. Yes, sir. It had no covering over it.
 "Q. All right. And Alabama Power Company knew when they put this line in that it didn't have any covering over it; is that correct?
"A. That's correct.
 "Q. And did Alabama Power Company and its engineers know that being bare wire and carrying 7,200 volts, if some piece of equipment were to contact it with a man on the other end operating it, that there was a serious injury — or a serious chance of a substantial injury or death?
 "A. Yes, sir. If anyone contacts a high-voltage line, he is going to be hurt.
 "Q. Did Alabama Power Company make their own choice, independently, not to insulate the line with any material?
"A. Yes, sir.
". . .
 "Q. . . . On the first work order there it indicates that Alabama Power Company's distribution system work order that Alabama Power Company had knowledge and notice that this was a mining area when they put in the bare wire?
"A. Yes, sir, we knew who our customer was.
"Q. A mining shop area; correct?
 "A. Yes. We knew it was a shop or office area. One said office I believe.
". . .
 "Q. Let me ask you something, Mr. Dow. So we will understand this, you would agree that at the time of George's injury that Alabama Power Company had received prior notice and knowledge, by virtue of their work orders, that some type of equipment higher than usual was going to be in the area, and therefore that necessitated Alabama Power Company raising their lines above the minimum of the tables?
 "A. Yes, sir. Our engineers determined that there would be large trucks driving under that span and going, apparently, down to the pit. So, we installed a taller pole than normal to get that line up higher than those trucks so that they could drive to and from that pit safely.
 "Q. Okay. All right. And on that occasion, Alabama Power Company received that knowledge some eight or nine years before George was injured; is that right?
"A. Yes, sir. It was I believe '66. *Page 1174 
 "Q. On that occasion, Alabama Power Company came in and they raised this pole down here 45 feet; is that right?
 "A. Yes, sir. As made known by the necessary conditions, they did that.
 "Q. All right. And then you came down at a later date and you raised this pole 45 feet; is that right?
 "A. Yes, sir. To install that transformer bank a 45-foot pole is required.
 "Q. And George got into the line between this 45-foot pole and this pole down here (indicating); right?
"A. Yes, sir.
"Q. What did you do with that pole?
 "A. To the best of my knowledge, nothing has been done with that pole since it was installed.
"Q. It stayed 35 feet?
"A. Yes, sir.
 "Q. Wouldn't that create a situation where you have a line slanted?
"A. It would have some slant to it, yes, sir.
 "Q. What would that do, Mr. Dow, to a person's ability to perceive distance; do you know?
"A. I'm certainly not an expert in that field, no.
 "Q. Now, you mentioned a while ago that the reason you raised these poles down here to 45 feet was because you had notice that there was going to be trucks — were going to be trucks in this drive area. Now this drive area goes to the pit; right?
"A. That's my understanding that it does.
"Q. Where does it go the other way?
 "A. It goes into that open area that's indicated by just a circle, I guess you would say.
 "Q. As a matter of fact, it provides access into the same area where the gas pump is, doesn't it?
"A. Yes, sir.
 "Q. It provides access into the same area where this driveway went under this line, didn't it?
"A. Yes, sir.
"Q. But this pole down here wasn't ever raised?
"A. No, sir, it wasn't.
 "Q. And so that we are clear, the pole, the other pole that wasn't raised, was not raised at any time up until the time George got injured; is that right, over eight years?
"A. Pole 1 on the drawing?
"Q. Yes, sir.
"A. That's right. It's the same."
The line which Brooks contacted was installed by APCo in the shop area in 1966 to provide electrical service to the AlCo Mining Company, predecessor to Mitchell-Neely. AlCo, like Mitchell-Neely, was engaged in strip mining operations which require the use of large machinery, including the type of drilling rig used by Brooks. There was a gas pump located approximately 15 feet from the point where Brooks parked the rig prior to the contact. This pump was used regularly to refuel the mining equipment. Brooks testified that he had seen and worked with the boom raised around the line in question on previous occasions and was not aware that the boom could reach the line. At the time of contact, the rig was parked in part of a driveway which ran through the shop area between the gas pump and the line in question. Part of this driveway ran beneath the line contacted. APCo raised an adjacent span of lines to allow adequate clearance for large trucks traveling on this driveway to and from the pit. Although the adjacent lines raised did not include the one actually contacted by Brooks, the driveway passing under them provided access to the shop area where he was injured. Extra lines were added in the shop area to accommodate the use of certain power tools generally associated with maintenance work. APCo representatives worked in the shop area on at least three occasions prior to the date of Brook's injury, and an inspection, according to the testimony of William Dow, probably occurred shortly before the date of contact.
In light of the above evidence, reasonable men could differ as to whether APCo had sufficient notice so as to have *Page 1175 
anticipatd that employees of Mitchell-Neely might operate, service, refuel, or repair their mining equipment, including the subject drilling rig, in the shop area within close proximity to the uninsulated line. "Where the facts upon which the existence of a duty depends, are disputed, the factual dispute is for resolution by the jury." Alabama Power Companyv. Alexander, 370 So.2d 252, 254 (Ala. 1979). Therefore, we find no error on the trial court's part in submitting the notice issue to the jury.
APCo also raises numerous points of error on the part of the trial court in support of its argument that it was entitled to a new trial. It contends that the trial court erred in refusing its requested jury charges 11, 12, and 20, which read as follows:
"CHARGE NO. 11.
 "I charge you that Alabama Power Company, as a supplier of electricity, is not an insurer and is not under an obligation to so safeguard its wires or equipment that by no possibility can injury result therefrom. Its duty in this regard is to exercise that degree of care commensurate with the danger involved.
"CHARGE NO. 12
 "I charge you that Alabama Power Company did not have a duty to safeguard its wires from contact at a place where it cannot be reasonably anticipated that any person would likely or probably come in contact therewith or be injured thereby.
". . .
"CHARGE NO. 20
 "The Court charges the jury that unless Alabama Power Company has actual or constructive notice that any drill raising activity was in progress at a site under or in close proximity to its power lines, then Alabama Power Company had no duty to insulate the wires or take other precautionary measures unless under the totality of circumstances, Alabama Power Company should have reasonably anticipated that persons pursuing business or pleasure might come in contact with the power lines."
Again, we disagree. Charge 11 is a correct proposition of law, but was properly refused because, as framed, it might easily have misled the jury as to the primary issue in this case and point intended to be emphasized, viz., that APCo is under an obligation to insulate its lines so as to prevent injury only where it may reasonably be anticipated that persons may come into contact with them. Torian v. Ashford, 216 Ala. 85,112 So. 418 (1927).
APCo's duty to safeguard and insulate arises in the presence of notice, actual or constructive, that persons "may" come into contact with its uninsulated lines, Bush v. Alabama Power Co.,supra, not pursuant to notice that persons would "likely" or "probably" come into contact with them. Therefore, it was not error to refuse charge 12. Charge 20 was also properly refused because it would require APCo to have notice of the specific activity of "drill raising" in order to establish a duty. The activity that places APCo on notice that persons may come into contact with its lines does not have to be the same activity involved in the injury-producing accident. Alabama Power Co. v.Smith, supra.
APCo also contends that the trial court erred by admitting into evidence several published articles (Exhibits 1-3) and certain excerpts therefrom (Exhibits 5-7). It argues that the articles are hearsay, not being properly authenticated under the "learned treatise" exception to the hearsay evidence rule and that the excerpts are not relevant to any issue in the case.
In the recent case of Johnson v. McMurray, 461 So.2d 775, 779
(Ala. 1984), the Court stated:
 "The rule in Alabama, generally, is that `a learned treatise, essay, or pamphlet on a subject of science or art, which is testified to by an expert on the subject as being a standard or trustworthy authority on the subject, is admissible as an exception to the hearsay evidence rule.' C. Gamble, McElroy's Alabama Evidence, § 258.01 (1) (3d ed. 1977)." *Page 1176 
David MacCullum, a consulting safety engineer, testified as follows:
 "Q. I'll ask you, Mr. MacCullum, if you are familiar with a gentleman by the name of Paul Sheppard?
"A. Yes, sir.
". . .
"Q. Were you familiar with his work?
"A. Yes, sir.
 "Q. All right. I will ask you if you are familiar with an article published by Mr. Sheppard in 1958 in the National Safety News entitled "Crane Contacts Can Kill"?
 "A. Yes, sir. He wrote it while he was still an employee of the National Safety Council.
". . .
"Q. You are familiar with this document?
"A. Yes, sir.
 "Q. I note that it was published in the National Safety News. Would you tell the ladies and gentlemen of the jury what the National Safety News was?
 "A. The National Safety News is a publication of the National Safety Council. The National Safety Council is a nonprofit organization, like the American Cancer Society, which has been recognized by Congress as the agency that addresses this area of human concern.
 "Q. I'll ask you, Mr. MacCullum, have you had occasion in the course of your work as a safety engineer to read and study and see this document?
"A. Yes, many times.
". . .
 "Q. Based upon that fact, Mr. MacCullum, and your background and experience in the field, is this document, in your judgment and opinion, a trustworthy and reliable document in its field?
"A. Yes, sir.
 "Q. I will ask you, Mr. MacCullum, are you familiar with the provisions of that document as they relate you to the statistical data involving people killed and injured in this country by industrial equipment contact with power lines?
"A. Yes, sir.
 "Q. Are those provisions of the article trustworthy and reliable?
"A. Yes, sir.
 "MR. HOOKS: Judge, we would offer this as Plaintiff's Exhibit No. 1.
". . .
 "Q. All right. Mr. MacCullum, I'll show you what I have marked for identification as Plaintiff's Exhibit No. 5, sir, and ask you if this is in fact an excerpt of Mr. Sheppard's article?
"A. That's the first several lines of it.
 "Q. All right. Is that an excerpt of the article that you hold before you, Plaintiff's Exhibit No. 1?
"A. Yes, sir.
 "MR. HOOKS: All right. Judge, we would offer this as Plaintiff's Exhibit No. 5."
Predicates to the admission of the remaining exhibits were laid in substantially the same form. APCo does not dispute the qualification of MacCullum as an expert in the field, only that the predicates were insufficient in that they did not also refer to each of the exhibits as being "standard." However, as previously noted in Johnson v. McMurray, supra, it is sufficient that the article is authenticated by a properly qualified expert as being a trustworthy authority on the subject. Therefore, the trial court did not err in admitting Exhibits 1-3.
APCo, relying on Murray v. Alabama Power Co., 413 So.2d 1109
(Ala. 1982), further insists that the excerpts from the articles (Exhibits 5-7) were irrelevant and, thus, inadmissible because they contain statistical information concerning prior electrical contact injuries incurred across the country. It argues that there was no showing that these accidents were not too remote or occurred under substantially the same conditions and circumstances as existed in the present case.
The Court in Murray v. Alabama Power Co., supra, was following the general rules stated by McElroy: *Page 1177 
 "On an issue of whether a place or thing was safe or dangerous at the time of the accident in question, evidence of the occurrence or non-occurrence of accidents to others at other times, in the use of such place or thing, is admissible if the condition of the place or thing at such other times was substantially the same as the condition existing at the time of the accident in suit."
C. Gamble, McElroy's Alabama Evidence § 83.01 (1) (3d ed. 1977).
 "In an action for injury, allegedly caused by the defendant's negligently keeping or maintaining a dangerous place or machine, evidence of notice to the defendant, prior to the accident in suit, of the alleged dangerousness is relevant to the issue of negligence. Consequently, as tending to prove such notice, plaintiff may prove the occurrence of other accidents at such place or machine, prior to the accident in suit, if the place or machine was in substantially the same condition as it was at the time of the accident in suit. The plaintiff may also prove, as tending to show such notice to the defendant, that other associated parts of the place, where the accident in suit occurred, were in a defective condition at the time of such accident. If the injury was caused by a machine, the plaintiff may prove that the machine was of a class of machines all of which were in bad condition. Specific relevant reports to the defendant prior to the accident in suit are admissible to show notice to him."
Id. at § 64.04 (1).
In the present case, the statistical information in question was not introduced to prove that the shop area of the Lanco Pit operation was, in fact, dangerous or unsafe at the time of the accident or that APCo knew or should have known that such a dangerous condition existed there. Its purpose was to show the existence of national, industry-wide evidence of a serious problem resulting from certain types of equipment contacting uninsulated power lines, and it was relevant as to the degree of care exercised by APCo in the inspection and maintenance of its lines. There was no error in the admission of Exhibits 5-7.
APCo also attacks the verdict as being a quotient verdict. In support of its contention in this respect, it submitted to the trial court the affidavits of S. Allen Baker, Jr. (counsel for APCo), Charles L. Logsdon, Richard I. Allison, and Shari Womack. Mr. Baker's affidavit shows that the day after the rendition of the verdict and dismissal of the jury, he contacted Mr. Logsdon, the foreman of the jury, and apparently questioned him as to the method by which the jury had arrived at the sum of $452,496.00. At his request, Mr. Logsdon mailed to him a number of pieces of paper containing notes and calculations indicating the method of computation utilized by the jury. In his affidavit, Mr. Logsdon stated, in pertinent part, as follows:
 "There was a considerable amount of controversy in the jury room regarding the liability of George Brooks and the liability of Alabama Power Company and whether George Brooks should recover any money. After several hours of discussion, the jury agreed to a formula that would be used and applied to any amount of money to be awarded to George Brooks. Attached as Exhibit A to this Affidavit is a true and correct copy of the piece of paper which has the computations that the jury used to determine the percentage of fault that Alabama Power Company had in George Brook's accident and the percentage of fault that George Brooks himself had causing his own accident. Each member of the jury stated what percentage of fault that Alabama Power Company had and what percentage of fault that George Brooks had. I took this information from each juror and put it on the piece of paper attached as Exhibit A, then all of the figures were added up and the total was divided by 12. The result of this computation was that the jury determined that there was 60% negligence on the part of Alabama Power Company in this accident and 40% negligence on the part of George Brooks himself *Page 1178 
in causing his own accident. We agreed in advance that the result of this computation would be applied to whatever money figure that we decided on.
 "Afterwards, each member of the jury wrote down on a piece of paper what amount of money they wanted to give George Brooks. A true and correct copy of each piece of paper which had the money award that each juror wanted to give George Brooks is attached hereto as Exhibit B (1 through 12 inclusive). Each figure set out on Exhibits B, 1 through 12 inclusive, were then put down on another piece of paper by me, a true and correct copy of which is attached hereto as Exhibit C. Exhibit C contains the results of the arithmetic which led to the verdict that was returned in this case. I added up each of the amounts that each juror wanted to award the plaintiff and the resulting total was divided by 12. Then the 60% figure referred to in Exhibit A above was multiplied times the total of $754,160, which resulted in the amount of $452,496. The result of these computations is the amount of the verdict that was returned in favor of George Brooks by the jury. Before these computations on the money awards were actually made, we agreed in advance that the total sum of each juror's award would be divided by 12 and would then be multiplied times 60% to determine the amount of the award to return in favor of George Brooks."
The affidavits of Allison and Womack are substantially similar.
Brooks moved to strike these affidavits on the ground that they disclosed confidential jury room deliberations and sought to impeach the verdict. The trial court reserved its ruling on the motion to strike. Brooks then offered into evidence six juror affidavits contra to those submitted by APCo. One of the affidavits, that of Letitia D. Hasberry, in pertinent part, reads:
 "A verdict of $452,496.00 was returned in favor of George Brooks on February 23, 1984. At no time during our deliberations did the members of the jury agree in advance that each juror would write down a figure that he or she thought should be awarded to Mr. Brooks and to then be bound by the figures, or an average of the figures, or a quotient or any resulting amount. In fact we continued to deliberate and to disagree after various figures were computed. Our computations were only a basis for further deliberations. The award we made was agreed to by everyone and was not determined by a commitment to be bound made in advance of any computations. In addition, there was no agreement among the jurors to allocate fault between George Brooks and Alabama Power Company by determining percentages of fault between the parties. To the best of my knowledge, the jury determined that Alabama Power Company was the party at fault in causing the accident and the jury did not ever make a determination that George Brooks was at fault or was negligent.
The remaining affidavits submitted by Brooks were similar in content.
Neither testimony nor affidavits of jurors are admissible to impeach their verdicts; however, such evidence is admissible to sustain them. Maring-Crawford Motor Co. v. Smith, 233 So.2d 484
(Ala. 1970), and cases cited therein. The juror affidavits submitted by APCo were for the obvious purpose of impeaching the verdict and, consequently, were inadmissible.[4] *Page 1179 
The affidavit of S. Allen Baker, relative to his receipt of the pieces of paper from juror Logsdon, was also inadmissible, as it would indirectly permit that to be done which could not be done directly. Maring-Crawford Motor Co. v. Smith, supra.
Those affidavits introduced by Brooks in support of the verdict were properly before the trial court and affirmatively show that there was no agreement among the jurors to be bound by a verdict reached pursuant to a predetermined method of calculation as argued by APCo. Proof of such an agreement is essential before a verdict may be declared a quotient verdict.Maring-Crawford Motor Co. v. Smith, supra. Because APCo has failed to meet its burden of proof in this regard, we find no basis for disturbing the lower court's order denying its motion for a new trial on the ground that the verdict was a quotient verdict.
During trial, Dr. William Stewart, a vocation rehabilitation specialist, testified for Brooks concerning his potential lost earning capacity. APCo contends that the trial court erred in admitting his testimony on the ground that he did not reduce the dollar amount of Brooks's future lost earnings to a present cash value. In connection with this alleged error, it argues that the trial court's reference to "present cash value" in its charge regarding the loss of future earnings was meaningless to the jury.
APCo failed to timely object to that portion of Dr. Stewart's testimony concerning the loss of future income and, therefore, any alleged error was not properly preserved and presented for our review.[5] Costarides v. Miller, 374 So.2d 1335 (Ala. 1979);Wilkinson v. Duncan, 294 Ala. 509, 319 So.2d 253 (1975);American Fire Casualty Co. v. Archie, 409 So.2d 854
(Ala.Civ.App. 1981).
APCo next argues that the trial court erred in limiting its cross-examination of Brook's expert witness, Charles Point, an electrical engineer, concerning certain provisions contained in the 1981 National Electric Safety Code (NESC). It was undisputed at trial that the 1961 NESC is authoritative in the electric utility industry and governed the installation of the lines in the present case. However, there was a dispute over which sections contained therein were controlling. APCo's expert witness, William Dow, testified that § 232 was applicable. Brooks's expert witness testified that the applicable sections were 200 (B) and (C), 210, and 211. By reference to the 1981 NESC and for purposes of strengthening Mr. Dow's opinion testimony, as well as impeaching that of Mr. Point, APCo sought to show that in the later edition §§ 200 (B) and (C), 210, and 211 were deleted.
In Carlisle v. Miller, 275 Ala. 440, 444, 155 So.2d 689, 691
(1963), the Court observed: *Page 1180 
 "The rule in our jurisdiction is that the latitude and extent of cross-examination is a matter which of necessity must rest largely within the sound discretion of the trial court, and unless this discretion is grossly abused the ruling of the trial court will not be overturned. Blount County v. Campbell, 268 Ala. 548, 109 So.2d 678."
In the present case, it cannot be said that the trial court abused its discretion in limiting the cross-examination. The publication of the 1981 NESC followed the date of the accident by approximately seven years, the date of the installation of the lines in question by fifteen years, and the date of publication of the controlling NESC by twenty years. The subsequent deletion alone of §§ 200 (B) and (C), 210, and 211 from the 1981 NESC is not relevant to show that they were not previously controlling.
Finally, we disagree with APCo's contention that the trial court erred to reversal by refusing its requested jury charge 16, which reads as follows:
 "16. The plaintiff, George Brooks, originally made a claim against Chicago Pneumatic Equipment Company and William Mitchell, and several other defendants in this case for damages growing out of the accident wherein George Brooks received his injuries. The plaintiff, in consideration of the sum of $225,882.70 released Chicago Pneumatic Equipment Company and William Mitchell and reserved his right to proceed against Alabama Power Company. If you are reasonably satisfied from the evidence that the plaintiff is entitled to recover in this case, then in arriving at the amount of damages to be awarded to the plaintiff you will determine from the evidence the total amount of damages suffered by the plaintiff and then give credit for the amount of $225,882.70, which the plaintiff has already been paid by Chicago Pneumatic Equipment Company, William Mitchell and the United States Fidelity Guaranty Company, and render a verdict for the plaintiff for the remaining balance."
APCo argues that United States Fidelity Guaranty Company (USF G), the workmen's compensation insurance carrier of Mitchell-Neely Mining Company, waived its right of reimbursement for benefits previously paid to Brooks under §25-5-11 (a), Ala. Code 1975, as additional consideration for the release of William Mitchell. By an amendment to its answer, APCo pleaded USF G's waiver of this right as a setoff against a potential verdict and alleged its value to be $13,882.70, reserving the right to prove both at trial.
The trial judge initially charged the jury that they should determine from the evidence the amount of damages suffered by Brooks and then give credit for the amount of $212,000.00, representing the cash settlement of Chicago Pneumatic Equipment Company and William Mitchell. APCo's requested charge, which reflects the waiver of USF G's right of reimbursement,[6]
assessing its value at $13,882.70, was properly refused because it was premature. Valuation of the right of reimbursement in this case required knowledge of both the jury's verdict and Brooks's liability for attorney fees and other litigation expenses. See Fitch v. Insurance Company of North America,408 So.2d 1017 (Ala.Civ.App. 1981). Moreover, the responsibility for crediting the verdict in this regard rested with the trial judge after he advised the jury that he would deduct the $212,000.00 from the verdict.[7] This new instruction was in response to a jury question that came after several hours of deliberation and was agreed to by counsel for both APCo and Brooks.
The judgment of the trial court is affirmed.
AFFIRMED. *Page 1181 
TORBERT, C.J., and MADDOX, FAULKNER, BEATTY and ADAMS, JJ., concur.
[1] Chicago Pneumatic Equipment Company and William Mitchell were also named as defendants, but prior to trial settled for $175,000.00 and $37,000.00, respectively.
[2] The trial court credited against the verdict the sum of $212,000.00, which represented the consideration for the case settlements of Chicago Pneumatic Equipment Company and William Mitchell.
[3] Brooks suffered severe burns which resulted in the amputation of his right leg and portions of his left foot and hand.
[4] Alabama Fuel Iron Co. v. Powaski, 232 Ala. 66, 166 So. 782
(1936), relied upon by APCo as providing for the admissibility of the affidavits under an exception to the general rule, is distinguishable. In that case, the Court adhered to the longstanding rule that affidavits concerning the debates and discussions of the case by the jury during deliberations are inadmissible for the purpose of impeaching the verdict. The Court did acknowledge that a verdict may be impeached through proof of extraneous facts, Alabama Fuel Iron Co. v. Rice,187 Ala. 458, 65 So. 402 (1914) (wherein there was an improper and coercive communication made by the bailiff to the jury), and that, under certain circumstances, jury room deliberations are admissible to corroborate a prima facie showing of such extraneous facts or events occurring outside the jury room which affected the verdict (e.g., juror's acceptance of a bribe in consideration for a vote or willful concealment of information during voir dire). In the present case, the affidavits offered by APCo (which include the papers attached thereto) do not concern extraneous facts and, therefore, are not within the rule of Powaski, supra.
[5] Counsel for APCo did not object to this portion of Dr. Stewart's testimony until the following day during a conference in the trial judge's chambers. At that time, counsel for APCo was instructed that he would thereafter have the opportunity to cross-examine Dr. Stewart as to what method he used in calculating the lost earnings. The record shows that, on cross-examination, Dr. Stewart did, in fact, testify as to the present value of Brooks's future lost earnings:
 "Q. Now, you did not — you cannot take that — or did you take that $499,000 figure and determine what figure represents the present value of that money?
"A. Only in terms of the way I just explained it.
"Q. You are not an economist now?
"A. No, I am not.
 "Q. You are not an actuary that works with insurance companies?
"A. No, I am not.
 "Q. You gave us a figure then that the present worth of that $499,000 figure is, what it's worth today?
 "A. Based on the way I calculated the figures, it would be that amount."
[6] $225,882.70 = $212,000.00 + $13,882.70.
[7] The first opportunity which APCo had to prove the value of USF G's right of reimbursement was subsequent to the jury's verdict, prior to entry of judgment by the trial court. We note from the record that APCo never attempted to do so.