CRAWLEY, Judge.
On November 14, 1993, 15-year-old Aaron Coleman was injured when a 32-foot citizen band radio (“CB”) antenna that he was disposing of came into contact with an uninsulated power line owned by Alabama Power Company (“APCo”). Coleman suffered electrical burns to his left hand and had to have his left leg amputated below the knee. He and his parents, Jim and Annette Coleman, sued APCo, alleging that APCo had negligently and/or wantonly breached a duty to insulate its power lines, a duty to warn of the danger of contact with those lines, and a duty to inspect those lines. APCo moved for a summary judgment, arguing that, under the facts of this case, it owed no duty to Aaron Coleman to warn or.to insulate.[1] The trial court entered a summary judgment for APCo on both the negligence claim and the wantonness claim. The Colemans appealed to the Alabama Supreme Court, which transferred the case to this court pursuant to Ala.Code 1975, § 12-2-7(6). We affirm.
Aaron Coleman lives with his parents, next to Mr. Ronnie Boyd off Redland Road in Elmore County. Another family, the Maness family, lives on the other side of Mr. Boyd’s property; Mr. Don Westbrook, an APCo employee, lives next door to the Maness family. All of the lots in this area abut a large, winding gully. A portion of the gully, approximately 15-feet deep at that point, abuts the back of Boyd’s property; a portion of the gully runs underneath the power line. The view of the gully behind Boyd’s house is obstructed by kudzu and other vegetation.
Since approximately 1988, Boyd has dumped debris in that gully, for the purpose of filling it in. He arranged to have a friend who works in the roofing business, James Price, dump roofing shingles and fill dirt into the gully. Price and his crews would transport shingles or fill dirt to the gully via dump truck. This practice continued at least until the date of the accident. Boyd instructed Price and his crews not to fill the gully above ground level because he did not want the shingles and other debris to be seen from surrounding areas.
The power line behind Boyd’s property is a portion of the Yates Dam transmission line. It is uninsulated and has been in place since 1920. The line carries approximately 46,000 volts of electricity. The line is approximately 28 feet above the ground at its lowest sag *58 point. It is in compliance with the National Electric Safety Code (“NESC”).
In November 1993, Aaron Coleman requested permission from Boyd to dispose of the CB antenna in the gully. Boyd granted Aaron that permission. The antenna was in pieces; two pieces were approximately 10 feet long and the third piece was approximately 32 feet long. Coleman disposed of the 10-foot pieces by carrying them parallel to the ground and tossing them into the gully. However, he picked up the 32-foot piece at one end and “walked up the pole up with his hands.” As he lifted the antenna, it either came into contact with the uninsulated power line or came dangerously close to the uninsulated power line, thus causing the electric current to “arc” to the antenna.
Our standard for reviewing a summary judgment is de novo; we apply the same standard the trial court applies. A motion for summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing “that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.” Rule 55(c); see Lee v. City of Gadsden, 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, “the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by ‘substantial evidence.’” Lee, 592 So.2d at 1038. “Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see Ala.Code 1975, § 12-21-12(d). See West, 547 So.2d at 871, and Bass v. SouthTrust Bank, 538 So.2d 794 (Ala.1989), for further discussion of the application of the summary judgment standard.
The Colemans argue that APCo had a duty either to insulate the lines behind Boyd’s house or to warn of the danger of contact with the power lines by either posting warning signs or placing orange warning balls on the power line itself. According to them, there exists a genuine issue of material fact concerning APCo’s duty and that issue precludes a summary judgment. After carefully considering the evidence presented by both parties and the law concerning a power company’s duty to insulate, we disagree.
“[A] supplier of electricity ... is not an insurer of the safety of the general public and is not under an obligation to so safeguard its lines or equipment that by no possibility can injury result therefrom. The duty of an electrical company is to exercise that degree of care commensurate with the danger involved.”
Central Alabama Elec. Coop. v. Tapley, 546 So.2d 371, 378 (Ala.1989).
“ ‘ “The duty of an electric company, in conveying a current of high potential, to exercise commensurate care under the circumstances, requires it to insulate its wires, and to use reasonable care to keep the same insulated, wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith. This statement of the rule implies that ... it is not necessary to insulate wires which are so placed that no one could reasonably be expected to come in proximity to them.” ’ ”
Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala.1979) (citations omitted).
In Alexander, the plaintiff was injured when a 37-foot length of pipe, which was being removed from a well being drilled 20 feet from the power line, contacted the power line. Alexander, 370 So.2d at 253. According to the court, there was no evidence that APCo had notice that any well-drilling was being conducted at a site near the power lines and, the supreme court said, “[ajbsent this notice, [APCo] had no duty to insulate the wires or take other precautionary measures unless under the totality of circumstances, [APCo] should have reasonably anticipated that persons, pursuing business or pleasure, might come in contact with the power lines.” Id. at 254. The supreme court later explained that there are two bases for finding that APCo had a duty to insulate — its having actual or constructive notice of an activity that presents the danger of contact *59 with the power line or its having knowledge of facts that, based upon the totality of the circumstances, gives it cause to reasonably anticipate that a person could come in contact with its power line. See Alabama Power Co. v. Cantrell, 507 So.2d 1295, 1298-99 (Ala.1986); see also Foster v. Alabama Power Co., 395 So.2d 27, 31 (Ala.1981).
The Colemans argue that APCo, during routine aerial inspection of its power lines, should have seen, or did see and ignored, evidence of dumping underneath the power lines in the gully behind Boyd’s house, and that such notice triggered the duty to insulate or warn. However, the Colemans have no documentary or testimonial evidence that an APCo aerial surveyor (either an employee or an independent contractor, depending on whether the inspection was performed in a fixed-wing airplane or in a helicopter) or any other APCo employee or agent ever documented seeing debris, shingles, or dirt in the gully behind Boyd’s house.
Judson Gaines, a transmission lines supervisor for APCo, testified concerning the purposes of, and procedures for, aerial inspections of APCo’s power lines. According to Gaines, the main purpose for the aerial inspections is to observe and assess the condition of APCo’s equipment and facilities. By observing and assessing the condition of the facilities, says Gaines, APCo can determine whether the lines or poles need repair or replacement and can identify potential problems that could cause an interruption in service. Gaines admitted that, as a by-product of the aerial inspections, the surveyor is able to note encroachments or activities under or around the power lines. According to Gaines, the surveyor notes those things that, based upon his experience, he determines might pose a risk of contact with the power lines. Gaines also testified that, if he had been told that a surveyor had seen roofing shingles, debris and fill dirt in the gully, as depicted in the photographs of the accident site, and had seen evidence of vehicle tire tracks leading to the edge of the gully, he would attempt to find out who had been dumping the debris and how it was being dumped.
The Colemans’ expert, Owen S. Posey, testified that, based on the other items noted in the aerial reports, he thought the aerial surveyor should have seen the debris in the gully. Those aerial reports noted that the surveyor had discovered such things as bird holes in power poles, vine growth on power lines, deer stands on power poles, and construction equipment under or around the power lines. Posey’s conclusion appears to be that if an aerial surveyor saw minute details like bird holes in the power poles, he had to have seen and ignored the debris in the gully. However, the surveyor’s purpose was to determine whether the equipment or facilities need repair or replacement; this purpose required him to closely inspect the power line and the poles themselves. The mere fact that he noted bird holes does not indicate that he had to have seen the debris in the gully. And even if he did see the debris in the gully, he would not necessarily have noted it if he did not think that it was the result of an activity that posed a danger of contact with the power line.
The Colemans also contend that the testimony of Don Westbrook, one of the Cole-mans’ neighbors and an APCo employee, supports their argument that APCo had notice of the dumping activities. Westbrook lives two houses down from Boyd; his property abuts the gully as well. He testified that he had dumped some debris in “his” portion of the gully and had seen some other debris in the gully on either side of his property. Westbrook did not testify that he had seen any debris in the gully behind Boyd’s house or that he had seen any signs of dumping activity at that location before the accident.
The Colemans argue that a factual question remains concerning whether APCo had notice of dumping activity in the gully and, despite this notice, failed to insulate or warn. The Colemans contend that Posey’s testimony creates a genuine issue of material fact concerning whether APCo had a duty to insulate or to warn. However, APCo argues that this factual dispute, if it exists, is not material, and that, under the facts of this case, it simply had no duty to insulate or to warn. We agree.
*60 Alabama law does not make APCo an insurer of the safety of the public. Tapley, 546 So.2d at 378. As stated previously, APCo’s duty to insulate or warn arises only when it has actual or constructive notice of an activity that presents the dánger of contact with the power line or when it has evidence that, based upon the totality of the circumstances, gives it cause to reasonably anticipate that a person could come in contact with its power line. See Cantrell, 507 So.2d at 1298-99; see also Foster, 395 So.2d at 31. A discussion of several electrical-contact cases is helpful in understanding when APCo is under a duty to insulate or warn.
In Bush v. Alabama Power Co., 457 So.2d 350 (Ala.1984), the supreme court reversed a summary judgment entered for APCo and remanded the case for trial. The plaintiffs, William Bush and James David Armstrong, were injured when the scaffolding they were moving across a country club’s outdoor tennis courts contacted an uninsulated power line. Bush, 457 So.2d at 352. Bush was employed by Dennis Laing, a tennis pro who gave lessons at the club, and Armstrong was employed by Lonnie Manning, an independent contractor hired by the club to replace the bulbs in the lights on the tennis courts. Id. After Manning and Armstrong had finished replacing light bulbs for the day, Laing asked Bush and Armstrong to move the scaffolding to the corner of the tennis courts. Id.
The accident' occurred less than seven months after APCo had been out to work on the switch into which the system of power lines at the club was attached. Id. at 354. The switch was located on a pole in one corner of the tennis courts. Id. The entire tennis court, and its light poles, could be seen from the switch pole. Id. The light poles varied in height from 25 to 35 feet, while the power line was approximately 30 feet above the ground. Id. at 352. The supreme court said that a genuine issue of material fact existed because reasonable men could differ as to whether APCo knew or should have known of the possibility of contact with its power line. Id. ‘The court, after quoting the passage quoted earlier in this opinion concerning the duty to insulate (from Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala.1979)), stated: “[T]he duty to insulate an electrical wire ... [does not] arise[ ] unless it is foreseeable that persons may come into contact with the wire. The ultimate test of a duty to use care is found in the foreseeability that harm may result if care is not exercised.” Bush, 451 So.2d at 353 (citation omitted). After applying that test, the court stated that it could not say that contact with the power line was or was not foreseeable as a matter of law. Id. at 354.
In Alabama Power Co. v. Brooks, 479 So.2d 1169 (Ala.1985), APCo appealed a judgment entered on a jury verdict in the plaintiffs favor, arguing that it was entitled to a directed verdict or a JNOY. The supreme court affirmed the judgment and held that the case was properly submitted to the jury because there remained a question of fact concerning whether APCo was aware of the possibility of contact with its lines by mining equipment at a mining company. Brooks, 479 So.2d at 1175. The plaintiff, Brooks, was injured when he raised the boom of his drilling rig into an uninsulated power line while servicing the rig in the shop area. Id. at 1171. Testimony at trial established that
“APCo [had] raised an adjacent span of lines to allow adequate clearance for large trucks traveling on [the] driveway to and from the pit. Although the adjacent lines raised did not include the one actually contacted by Brooks, the driveway passing under them provided access to the shop area where he was injured.”
Id. at 1174. According to the court, under these facts, “reasonable men could differ as to whether APCo had sufficient notice so as to have anticipated that employees of [the mining company] might operate ... their mining equipment ... in the shop area in close proximity to the uninsulated line.” Id. at 1174-75.
In Alabama Power Co. v. Cantrell, 507 So.2d 1295 (Ala.1986), the supreme court affirmed another judgment entered on a jury verdict for the plaintiff, despite APCo’s argument that it was entitled to a directed verdict or a JNOV. The plaintiffs husband was killed when the 30-foot television antenna he was *61 taking down came in contact with an uninsulated power line. Cantrell, 507 So.2d at 1296. The power line was approximately 9 feet away from the building on which the antenna had been mounted. Id. APCo argued that it was entitled to a directed verdict or a JNOV because it did not have “notice of the situation.” Id. The court disagreed:
“While no allegation is made and no proof is offered that APCo knew the antenna was to be taken down on this particular day, that is not the only requirement for our rule of notice. [APCo] is under a duty to insulate its wires wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith.”
Id. at 1297. The court also stated, “ ‘Where the facts, upon which the existence of a duty depends, are disputed, the factual dispute is for resolution by the jury.’ ” Id. (quoting Alexander, 370 So.2d at 254). According to the court, the facts established that the power line and the antenna could be clearly viewed from the street, that APCo meter readers read electric meters a few feet from where the antenna was located and may have needed to pass the antenna to reach the meters, and that the antenna had been in place for approximately two years. Id. at 1297-98. Although APCo did not have notice that the antenna was being removed from the building, the court held that the facts were such that reasonable minds could differ as to whether APCo, under the totality of the circumstances, should have reasonably anticipated that a person could come in contact' with its power line. Id. at 1297-99. Therefore, the supreme court concluded that case was properly submitted to the jury for resolution. Id. at 1298.
Likewise, in Central Alabama Elec. Coop. v. Tapley, 546 So.2d 371 (Ala.1989), the supreme court affirmed a judgment entered on a jury verdict against Central Alabama Electric Cooperative (the “Co-op”). The plaintiffs husband, Wendall Tapley, was electrocuted when, while cleaning the “trailer dump” on his tractor trailer rig in preparation for hauling another load of asphalt, he raised the trailer dump into an uninsulated power line. Tapley, 546 So.2d at 373. The power line had been erected by the Co-op, at the request of the asphalt plant’s owner, only one week before the accident that took Tap-ley’s life. Id. Before the line- was erected, Co-op officials met with the owner of the asphalt plant to discuss the location of the requested line. Id. While making that determination, the Co-op officials saw- trailer dumps like Tapley’s and other equipment being used at the plant and were informed of the approximate height of trailer dumps in their upright position (35-36 feet). Id. at 373-74. The Co-op officials decided not to string the line in an area where trailer dumps were typically in the upright position, apparently for that very reason, so they chose to string the line across the roadway leading into the plant. Id. at 374. The drivers of asphalt trucks had no designated area in which to clean out their trucks, so many areas near the entrance to the plant were used by the drivers for that purpose, including the flat, firm area underneath the newly erected power line, the area Tapley used on the morning of the accident. Id.
The Co-op argued that it was entitled to a directed verdict or a JNOV because it could not have reasonably anticipated that a trailer dump would be raised in the area underneath the uninsulated power line. Id. at 378. The supreme court disagreed. Id. Tapley’s expert had testified at trial that, although the power line was erected in compliance with the'minimum height standards of the NESC, it actually violated.the NESC because the Co-op did not consider local conditions in choosing the height of the line, as the NESC requires. Id. at 379. Based upon that testimony, the supreme court concluded that a fact question existed as to whether the Co-op should have foreseen the possibility that trailer dumps would be. raised in the area underneath the power line and whether the Co-op should have erected the power line higher or should have insulated it. Id.
However, in Alexander, which was discussed previously, the supreme court,, reversing a judgment entered on a jury verdict for the plaintiff, held that APCo owed no duty to the plaintiff because it did not have notice that well-drilling was being conducted near the power lines. Alabama Power Co. v. Al *62 exander, 370 So.2d 252, 254 (Ala.1979). The court also held that APCo could not have reasonably anticipated that a person would contact its power lines because it could not anticipate that a 37-foot length of pipe would be pulled from the well in one section or even that a well would be placed in proximity to the power lines, which had been there for approximately 10 years before the well was drilled. Id. at 255.
Similarly, in Campbell v. Alabama Power Co., 378 So.2d 718 (Ala.1979), the supreme court affirmed a summary judgment in favor of APCo in a wrongful death action. The plaintiffs husband, who was laying sewer pipe in a new subdivision, was killed when a crane to which he was fastening sewer pipe contacted an uninsulated power line. Campbell, 378 So.2d at 719. At the time of the accident, APCo had not yet received a request to service the subdivision. Id. at 720. According to the court, Mrs. Campbell, to prevail against the summary judgment motion, was required to present evidence that APCo had breached its duty to her husband. Id. To do that, the supreme court said, Campbell would be required to show “notice to APCo, either actual or constructive, of the presence of the crane being used to install storm sewer pipe in close proximity to the power line.” Id. Campbell presented no evidence that APCo had, or should have had, notice of the use of the crane near the power line, so the supreme court concluded that the summary judgment was. proper. Id. at 721.
And, in a ease remarkably similar to this case, the supreme court affirmed a summary judgment for APCo. Foster v. Alabama Power Co., 395 So.2d 27 (Ala.1981). The plaintiff, 15-year-old Richard Foster, was injured when he fell from a transmission tower after being shocked when he contacted an uninsulated line.[2] Foster, 395 So.2d at 28. The evidence presented by Foster was that there was a roadbed around the base of the tower and that the tower was a popular place for people to gather “to park and spend time.” Id. at 31-32. The supreme court stated that, although APCo “might have had reason to know that people were in the area and might be near the tower,” it did not have reason to know that people might be climbing its tower. Id. at 31. Therefore, under the facts presented, the court concluded that APCo did not have a duty to insulate its power lines. Id. at 32.
The Brooks and Tapley eases clearly illustrate that APCo is required to insulate its lines or take other precautions when it has notice that large machinery in use at a particular location may contact its power lines. See Brooks, 479 So.2d at 1174-75; Tapley, 546 So.2d at 379. In Campbell and Alexander, however, the plaintiffs lack of proof concerning APCo’s notice of the use of large machinery around the power line entitled APCo to a judgment as a matter of law. See Campbell, 378 So.2d at 720; Alexander, 370 So.2d at 254. In Bush, which has some similarities with Brooks and Tapley, the duty to insulate arose because APCo had at least constructive notice of a height conflict between its power lines and the light poles on the tennis courts. Bush, 457 So.2d at 352. In Cantrell, which the Colemans argue is controlling, APCo’s duty to insulate was again based upon constructive knowledge of facts that would give it reason to anticipate that a person could come in contact with the power line. Cantrell, 507 So.2d at 1297-99. The antenna was attached to a building less than 10 feet from the power line, was near the building’s electric meters, and had been attached for 2 years. Id. at 1297-98. In contrast, in Foster, APCo’s knowledge of the presence of persons in the area beneath its power lines did not give it reason to reasonably anticipate that someone would come in contact with its power lines by climbing the transmission tower. Foster, 395 So.2d at 31.
*63 Here, even if we assume that an APCo employee or agent knew that shingles and other debris had been dumped into the gully behind Boyd’s house, we fail to see how such knowledge either would create notice of an activity that presents a danger of contact with its power line or would give APCo cause to reasonably anticipate that a person could come in contact with its power line. See Cantrell, 507 So.2d at 1298-99, and Foster, 395 So.2d at 31. Like the situation in Foster, knowledge of debris under the power line in this case would give APCo notice that people were in the area, but that knowledge or notice is not sufficient to create a duty to insulate or warn. See Foster, 395 So.2d at 31.
For the duty to insulate or warn to arise, APCo would have to have had notice either that the dumping was being done by large dump trucks that posed a danger of contact with the line or knowledge of facts that would give it reason to reasonably anticipate that a person could come in contact with its lines. Knowledge of some debris in a gully is hardly the same as APCo’s knowledge in Cantrell, in which the facts demonstrated that the antenna was attached to a building located less than 10 feet from an uninsulated power line. Cantrell, 507 So.2d at 1297. The facts here establish that APCo may have known or perhaps should have known of shingles, debris, and fill dirt in the gully behind Boyd’s house. Shingles, debris, and fill dirt in a gully, without more, are insufficient to cause APCo to reasonably anticipate that a person could come in contact with its power lines.
The Colemans argue that because APCo should have known about the dumping in the gully, it then either should have known of, or should have investigated, the manner in which the shingles arrived at the gully. To require APCo to investigate every single item seen under or around its power lines and then to take steps to warn persons of the possible danger of contact with the lines would be tantamount to imposing a rule of strict liability, which is not the state of the law. See Bonner v. Electric Power Bd., 583 So.2d 260, 262 (Ala.1991) (“We do not hold that ... the [municipal power board] had the general duty to ascertain everywhere at the plant someone might operate a crane and make it contact electric lines.”). Alabama law does not make APCo an insurer of the safety of the public. Tapley, 546 So.2d at 378. It need only take steps to insulate or warn when it has notice of an activity that presents a danger of contact with the lines or knowledge of facts that give it cause to reasonably anticipate that a person could come in contact with its lines. See Cantrell, 507 So.2d at 1298-99, and Foster, 395 So.2d at 31. The summary judgment in APCo’s favor was proper as to the Colemans’ negligence claims; as to those claims it is affirmed.
The Colemans also argue that APCo was wanton in failing to insulate its power lines or warn of them danger. “Wanton conduct is ‘an acting with knowledge of danger, or' with consciousness, that the doing or not doing of some act will likely result in injury.’” Bonner, 583 So.2d at 262. As noted before, the Colemans presented no evidence that an APCo agent actually saw evidence of the dumping activity in the gully behind Boyd’s house. Therefore, the only “evidence” they have offered is an inference, based upon the other notations in' the aerial reports, that APCo should have known about the'dumping (“first inference”). The Cole-mans'then infer that, because APCo “knew” of the dumping activities, APCo also knew that serious injury or death could result (“second inference”). Finally, the Colemans infer that APCo deliberately chose to take no action to insulate or to warn despite this “knowledge” (“third inference”). To support their allegations of wantonness, the Cole-mans are basing, their second inference and their third inference on the first inference. This is impermissible. Id. (citation omitted). Therefore, the summary judgment was also proper as to the Colemans’ wantonness claims.
AFFIRMED.
YATES and THOMPSON, JJ., concur.
ROBERTSON, P.J., and MONROE, J., concur in the result.

. APCo originally argued in its summary judgment motion that Aaron Coleman was contribu-torily negligent, because he had testified that he knew the power lines were there and that contact with them was dangerous and could result in electrocution; however, APCo withdrew that argument at the hearing. The trial court did not consider it, and it is not an issue on appeal.

. Another issue in Foster was whether the doctrine of attractive nuisance applied. Foster, 395 So.2d at 29. The court determined that it did not because Foster was 15 at the time of the accident and the doctrine has historically been held inapplicable to children over the age of 14. Id. The Colemans argued in their response to APCo’s motion for summary judgment and on appeal that Aaron Coleman's age, also 15, classifies him as a child, and they apparently believe that this should somehow affect our analysis of the case. We disagree. Aaron, like Richard Foster, was shown to be a boy of intelligence, and his age is not relevant to the resolution of this appeal.