WOODALL, Justice.
Black Warrior Electric Membership Corporation (“Black Warrior”) appeals from a judgment entered on a jury verdict for Ronald McCarter in McCarter’s action seeking compensation for injuries he sustained when he contacted a power line owned and operated by Black Warrior. We reverse and remand.

I. Factual and Procedural Background

This case arose out of an accident that occurred September 14, 2006, on State Highway 14 (“the highway”) approximately one mile south of the intersection of the highway and State Highway 60 near Saw-yerville (“the intersection”). The highway runs north and south at the accident site, but makes a 90-degree turn at the intersection and then runs east and west. Alabama Power Company owns and operates the electrical-transmission lines running along the highway west of the intersection to a bridge across the Black Warrior River (“the west leg”), while the power lines running along the highway south of the intersection toward Sawyerville (“the *160 south leg”) are owned and operated by Black Warrior.
On the day of the accident, McCarter was a member of a crew employed by APAC Southeast, Inc. (“the crew”), to replace asphalt on the highway. For the preceding two or three weeks, the crew had been engaged in paving the west leg. On September 14, 2006, at approximately 7:00 a.m., the crew began paving the south leg, beginning at the intersection. McCar-ter was operating a “Roadtec SB-2500B Material Transfer Vehicle,” which throughout this litigation has been referred to as a “shuttle buggy.” In its operating position, the shuttle buggy travels between, and in tandem with, a dump truck loaded with hot asphalt and an asphalt spreader. The operator drives the shuttle buggy from a seating compartment located near the rear of the machine.
At approximately 2:00 p.m., the crew arrived at a point on the highway where Black Warrior had installed a “service tap” across the highway to provide electrical service for a residence on the east side of the highway. The service tap consisted of two lines. The lower of the two was a “neutral” line, which carries no electricity. Positioned a few feet above the neutral line was a “primary” line, which carried 7,600 volts of electricity. The height of the lines above the roadway is subject to the specifications of the National Electric Safety Code (“the NESC”). The specifications required 15'6" of clearance for the neutral line and 18'6" of clearance for the primary line. The shuttle buggy measures 14'8" at its highest point.
As the shuttle buggy began to pass under the power lines, McCarter attempted to raise one of the lines using an 8' metal pole. In the process of lifting the fine, he was electrocuted and received serious injuries to his arm and hand.
McCarter sued Black Warrior, alleging, in pertinent part, that Black Warrior negligently installed and maintained the power line by which he was injured. The case was tried to a jury on the theory that Black Warrior had maintained its lines at a height below that required by the NESC. More specifically, during opening statements to the jury, McCarter’s counsel stated, in pertinent part:
“Power companies have duties to the public. Those duties are to avoid exposing the public to any needless dangers. Now, that includes adhering to the safety codes that are set out by the [NESC]. Did a power company fail to live up to this obligation, then they are responsible for whatever harms might occur because of that failure.
“Now, the paving crew that’s going down the highway is working for a company called APAC. They are paving southbound on Highway 14, rocking and rolling, going along. All of a sudden one of the pavers looks up and sees this one low power line leading to that red, brick house and its just about to contact the paving machine that he’s on....
“Now, in that split second, Mr. Ronald McCarter, the paver who’s sitting on that shuttle buggy on top of it operating that machine at the time made a decision to pick up what’s called a lute. It’s about an eight to ten foot metal pole.... He decides to pick that lute up and reach out and try to prevent that wire from contacting that particular machine.
“Well, he does that successfully. Picks up the lute, lifts it over, and contacts the wire. Well, at that instant, rather than Mr. McCarter picking ... up and moving a telephone wire that hangs down pretty low or a cable wire that crosses the road and hangs down pretty low — or even a Black Warrior *161 neutral line that has no electricity through it — Mr. McCarter figures out that, you know what? That’s a power line. It’s got 7,600 volts of electricity in it. He figured it out because he got electrocuted when he tried to move it to try to prevent it from contacting that machine.
“Now, we’ve sued Black Warrior for one reason. That reason is right here. In this trial, you’re going to hear about the [NESC]. It’s a big, old book of standards that electric companies adhere to. At the bottom of this piece of paper, bottom [of] this posterboard here is one of the tables that tells the standards that electric companies are supposed to adhere to and it tells you how high these lines are supposed to be, and depending on where they are and how much electricity is running through them. We’re going to get into that in great detail throughout the week.
“I want you to remember this, it’s got to be 18 and a half feet tall. It’s got a lot of electricity running through it. If it’s the neutral, it’s gotta be 16 feet tall. We’re going to talk a lot about that. The reason we sued them is because of this particular code, because they failed to live up to that standard.”
(Emphasis added.)
Black Warrior moved for a judgment as a matter of law (“JML”) at the close of all the evidence. Following the denial of that motion, the trial court charged the jury on the duty owed by Black Warrior as it relates to notice:
“Ladies and gentlemen of the jury, [Black Warrior] is not an insurer of the • safety of the plaintiff nor is it under obligation to safeguard its wires that by no possibility can injury result therefrom. [Black Warrior] only had a duty to take precautions or remedy defects with respect to its power lines if it had actual or constructive notice of the defect or actual or constructive knowledge of facts that would give it reason to anticipate that a person might come in contact with a power line.
“If you find that [Black Warrior] did not have actual or constructive notice of a defect in this power line that would give it reason to anticipate a person might come in contact with the power line, you must find for [Black Warrior].”
The jury returned a verdict for McCarter. Black Warrior’s postjudgment motion for a JML was overruled, and Black Warrior appealed.
Black Warrior contended in its JML motions, as it does on appeal, that there was no evidence, let alone substantial evidence, indicating “that Black Warrior had actual or constructive notice that the height of the power line was defectively low so as to give Black Warrior reason to anticipate that a person, such as [McCar-ter], might come in contact with the power line.” Although Black Warrior argues on appeal both that evidence of its liability was insufficient to present a jury question and that the verdict was against the weight and preponderance of the evidence, the resolution of this case turns on the sufficiency of the evidence.

II. Discussion

“‘[T]he de novo “standard by which we review a ruling on a motion for a JML is ‘ “materially indistinguishable from the standard by which we review a summary judgment.” ”” ” McGee v. McGee, 91 So.3d 659, 663-64 (Ala.2012) (quoting Glass v. Birmingham Southern R.R., 982 So.2d 504, 506 (Ala.2007), quoting in turn Bailey v. Faulkner, 940 So.2d 247, 249 (Ala.2006)). “ When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts *162 to the nonmovant to present substantial evidence creating such an issue.’” Pittman v. United Toll Sys., LLC, 882 So.2d 842, 844 (Ala.2003) (quoting Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997)). “‘“Substantial evidence” is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ ” Long v. Wade, 980 So.2d 378, 383 (Ala.2007) (quoting Kmart Corp. v. Bassett, 769 So.2d 282, 284 (Ala.2000), quoting in turn West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). “Further, this Court has stated that ‘ “[ejvidence supporting nothing more than speculation, conjecture, or a guess does not rise to the level of substantial evidence.” ’ ” State Farm Fire & Cas. Co. v. Shady Grove Baptist Church, 838 So.2d 1039, 1041 (Ala.2002) (quoting McGinnis v. Jim Walter Homes, Inc., 800 So.2d 140, 145 (Ala.2001), quoting in turn Brushwitz v. Ezell, 757 So.2d 423, 432 (Ala.2000)).
“While this. Court has long held that companies engaged in the distribution of electricity are not subject to strict liability it has held:
“ ‘ “The duty of an electric company, in conveying a current of high potential, to exercise commensurate care under the circumstances, requires it to insulate its wires, and to use reasonable care to keep the same insulated, wherever it may reasonably be anticipated that persons, pursuing business or pleasure, may come in contact therewith....”’
“Curtis on Law of Electricity, § 510 (as quoted in Alabama Power Co. v. Mosley, 294 Ala. 394, 400, 318 So.2d 260, 264 (1975)); see Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala.1979)....”
Cherokee Elec. Coop. v. Cochran, 706 So.2d 1188, 1192 (Ala.1997) (emphasis added). “The obligation of the electric company to insulate is not absolute, but alternative, in its nature. ‘Either the wire must be insulated, or it must be so located as to be, comparatively speaking, harmless.’ ” Dwight Mfg. Co. v. Word, 200 Ala. 221, 224, 75 So. 979, 982 (1917)(quoting Curtis on Law of Electricity § 511 (emphasis added)).
Ordinarily, the existence of a duty is a question of law, and a trial court’s ruling on a question of law is reviewed de novo. Ex parte Farmers Exch. Bank, 783 So.2d 24, 27 (Ala.2000). However, “ ‘[wjhere the facts, upon which the existence of a duty depends, are disputed, the factual dispute is for resolution by the jury.’ ” Bush v. Alabama Power Co., 457 So.2d 350, 354 (Ala.1984) (quoting Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala.1979)).
Whether Black Warrior’s lines were, in fact, “defectively low” was sharply disputed at trial. Witnesses for Black Warrior testified that measurements were taken of Black Warrior’s lines immediately after the accident and that the lowest wire was found to be 16'2" above the roadway. McCarter, on the other hand, presented witnesses who testified that the neutral line would not have cleared the shuttle buggy at 14'8". However, Black Warrior argues that, even assuming the accuracy of McCarter’s witnesses, McCarter failed to present substantial evidence that Black Warrior had constructive notice[1] of the defect so as to fasten liability on Black Warrior for McCarter’s contact with its power line. We agree with Black Warrior.
*163 As evidence of notice, McCarter relied on testimony presented by Black Warrior. Specifically, Earnest Bryant, a representative of Black Warrior, testified that he had traveled underneath the power lines at the accident site on his way to work at approximately 6:30 a.m. on the day of the accident. Although Bryant testified that the lines were at the proper height at 6:30 a.m., McCarter contends that Bryant’s testimony presents substantial evidence that Black Warrior had constructive knowledge that the lines were not at the proper height. According to McCarter, the jury was free to ignore Bryant’s testimony to the extent it tended to establish the compliance of the lines but, nevertheless, to conclude that Bryant saw, or that he should have seen, that the lines were not in compliance with NESC standards. In particular, McCarter states that, “given that Black Warrior’s corporate representative testified that the lines were inspected that morning, Black Warrior should have known the lines were too low.” McCarter’s brief, at 33. In response to this argument, Black Warrior contends that such a conclusion can be reached only by improperly stacking inferences. We agree with Black Warrior.
“An ‘inference’ is a reasonable deduction of fact, unknown or unproved, from a fact that is known or proved. See, Malone Freight Lines, Inc. v. McCardle, 277 Ala. 100, 167 So.2d 274 (1964). ‘[A]n inference cannot be derived from another inference.’ Malone, 277 Ala. at 107, 167 So.2d at 281. An inference must be based on a known or proved fact. Id.”
Khirieh v. State Farm Mut. Auto. Ins. Co., 594 So.2d 1220, 1224 (Ala.1992) (emphasis added).
McCarter infers Black Warrior’s knowledge of a defect in the fines from the fact that Bryant failed to notice such a defect on the morning of the accident. However, that inference depends, in turn, on whether the fines were — in fact — below NESC standards at 6:30 a.m. McCarter infers that the fines were low at 6:30 a.m., apparently only because they were allegedly low that afternoon when the accident occurred. However, the state of the fines at 6:30 a.m. is a matter in hot dispute, rather than a “known or proven fact.”
In that connection, Black Warrior presented the testimony of its safety and fleet-maintenance director, Robert Tutt, who investigated the scene immediately after the accident. According to his un-controverted testimony, he discovered a gap of 5" to 8" at the base of the pole bearing the power fines, indicating that the pole had recently been forced over in the direction of the highway. This condition, he stated, caused the top of the pole to lean toward the highway by 12" or more, resulting in a lowering of the fines over the roadway. According to Tutt, there was “no trash or debris” in the gap, which indicated that the pole had been “freshly moved.” He opined that the pole shift was most likely caused by a “large piece of equipment” getting into the fines. Indeed, Bryant, himself, was called to the accident scene and allegedly found the fines “noticeably lower” than they had been at 6:30 a.m. No inference of knowledge of inadequate clearance can, therefore, be derived from Bryant’s traveling underneath the fines at 6:30 a.m. on the day of the accident.
In support of his position on the notice issue, McCarter relies on a number of cases from this Court, namely, Central Alabama Electric Cooperative v. Tapley, 546 So.2d 371 (Ala.1989) (disapproved of on unrelated grounds by Robbins v. Sanders, 927 So.2d 777 (Ala.2005)); Alabama Power Co. v. Capps, 519 So.2d 1328 (Ala.1988); Alabama Power Co. v. Cantrell, 507 So.2d 1295 (Ala.1986); Alabama Power Co. *164 v. Brooks, 479 So.2d 1169 (Ala.1985); and Bush v. Alabama Power Co., 457 So.2d 350 (Ala.1984). However, these cases are distinguishable.
In Tapley, Wendall M. Tapley, “a truck driver employed by Diversified Support Services to haul asphalt and related materials to and from an asphalt plant, was killed when he raised the ‘trailer dump’ of his tractor-trailer rig into an uninsulated electric distribution line ... owned by CAEC [Central Alabama Electric Cooperative].” 546 So.2d at 373. The accident happened on the premises of the asphalt plant less than a week after CAEC had installed the line. Id. At the time the line was installed, CAEC knew that it could not install its line across areas of the plant where “dumping was obviously taking place,” because of the height of unloading dump trucks. 546 So.2d at 374 (emphasis added). Consequently, CAEC’s officials decided to string the “line across the roadway to the asphalt plant” where the accident occurred, id., at an elevation “well below the height to which the truck beds were raised,” despite “knowing that truck beds were raised in several locations on the premises.” 546 So.2d at 380 (emphasis added). Under such facts, this Court held that a jury question was presented as to foreseeability and notice. 546 So.2d at 379.
The facts in Capps were similar. That case involved a dump-truck operator who was fatally electrocuted on the premises of a “sand and gravel mining operation,” 519 So.2d at 1329, when he raised the bed of his truck into a power line owned and operated by Alabama Power Company (“APCo”). Rejecting APCo’s argument that the jury verdict in favor of the admin-istratrix of the operator’s estate was contrary to the weight and preponderance of the evidence, this Court stated:
“[APCo] undisputedly knew that the large items of equipment were present in the vicinity of the lines. These lines were installed specifically to serve this mining operation. Indeed, a large piece of equipment had torn down the lines about 200 yards from the site of this particular occurrence less than two months earlier.”
519 So.2d at 1329 (emphasis added).
Brooks also involved a jury verdict against APCo in an action by an equipment operator who was injured when he raised the equipment he was operating into APCo’s power line. The plaintiff was George Brooks, who was operating a “mobile drilling rig” on the premises of a mining company in connection with his employment. 479 So.2d at 1171. The accident occurred on a part of a driveway running to the shop area of the premises. Id. at 1174. Some years before the accident, “APCo [had] raised an adjacent span of lines to allow adequate clearance for large trucks traveling on this driveway to and from the [mining] pit.” 479 So.2d at 1174 (emphasis added). The line on which Brooks was injured had not been raised, although the driveway that ran under it was part of the driveway running underneath the adjacent lines that had been raised. Under these facts, the Court concluded that “reasonable men could differ as to whether APCo had sufficient notice so as to have anticipated that employees ... might operate, service, refuel, or repair their mining equipment, including the subject drilling rig, in the shop area within close proximity to the uninsulated line.” Id. at 1174-75.
In Cantrell, a fatal electrocution occurred during the decedent’s attempt to remove a 30' television antenna from the roof of an apartment building, which was located within 9' of APCo’s power line. *165 507 So.2d at 1296.[2] Applying the then applicable “scintilla rule,” this Court held that a jury question as to APCo’s duty to insulate the power line was presented by the following facts:
“[A]n aluminum antenna, set up on an apartment building and near an uninsulated power line might be reasonably foreseeable as an object which could be energized if it touched the power line; this apartment was on the main street of Springville, Alabama, and both the power line and the antenna could be clearly viewed from the street; there are two electric meters, owned by APCo, on the side of the building a few feet from where the antenna was located, and the jury could have found that to examine the meters it would be necessary for anyone walking from the street to pass by the antenna; testimony was given that APCo meter readers had been seen in the neighborhood; and that the antenna had been in place about two years.”
507 So.2d at 1297-98.
Finally, in Bush, this Court reversed a summary judgment in favor of APCo in an action against it for injuries sustained by two workers at the Country Club of Mobile (“the Club”) in connection with an operation to replace bulbs in the lights over the outdoor tennis court. The operation had occasioned the construction of a metal scaffold 33'3" high for the purpose of reaching the bulbs, which were situated “at various spots around the tennis courts.” 457 So.2d at 354. The workers were electrocuted when the scaffold they were pushing contacted APCo’s power line, located “approximately 30 feet above the level of the tennis court.” 457 So.2d at 352. On the issue whether “it was foreseeable that persons would come into contact with the electrical wires which stretched across the tennis court,” this Court stated:
“It is undisputed that the tennis courts and the lights for the courts had been in place since the 1960’s. It is also undisputed that the power company had been out to the site to work on the switch into which this system of wires is attached. The switch is located on a pole in one corner of the tennis courts, and, from the switch and this pole, it is possible to see the tennis court layout, the lights, and the system of wires. Additionally, the power company had been on the site to do extensive repairs to this system after Hurricane Frederic came through in September 1979. This accident occurred less than seven months later.
“... The record shows that the wires crossed over the tennis court area, and that there were lights at various spots around the tennis courts. The lights were atop poles 25 to 35 feet in height. Whether the power company, under these facts, should have foreseen that someone would come in contact with its uninsulated wires while repairing the lights is purely a question of fact.”
457 So.2d at 354 (emphasis added).
None of these cases involved an issue, as does this one, of displacement of a power line by an unknown agency independent of the power company before the accident in question. Thus, they are not controlling here.
Black Warrior presented prima facie evidence that it had no knowledge of the alleged defect in its lines before the accident. Consequently, the burden then shifted to McCarter to present substantial evidence creating an issue as to such notice. Pittman, 882 So.2d at 844. However, the only evidence presented as to when *166 the lines allegedly came to be below NESC standards amounted to speculation and conjecture. McCarter presented no substantial evidence from which it could be inferred that the lines were defectively low when Bryant passed under them at 6:30 a.m. or at any time of sufficient duration to give Black Warrior notice of the alleged defect. The trial court erred, therefore, in denying Black Warrior’s motion for a JML.
For the first time on appeal, McCarter attempts to invoke the doctrine of res ipsa loquitur to support the jury’s verdict. He now proposes that it was the neutral line that he touched, which had, for unknown reasons, become charged with electricity, resulting in his injuries. Relying on George v. Alabama Power Co., 13 So.3d 360 (Ala.2008), he now asserts that he was not required to prove notice as discussed above, because, he says, the jury could properly have concluded that the facts of this case gave rise to a presumption of negligence, which Black Warrior failed to rebut. However, McCarter cannot now rely on the doctrine of res ipsa loquitur.
To be sure, this Court did hold in George that the doctrine of res ipsa loquitur was applicable in an electrocution accident involving the apparent energization of a neutral line through some agency unknown to the plaintiff. More specifically, it held that the doctrine applied to preclude a summary judgment for APCo on the plaintiffs negligence claim. George, however, is in-apposite for a number of reasons.
In George, for example, the plaintiffs theory of the case was that he touched a neutral line and was injured because the electrical system was not functioning properly for a reason, or reasons, upon which.there had been no proof. By contrast, McCarter’s theory of the case in the trial court — as well illustrated in his opening argument — was merely that he touched a primary line because the lines were lower than the NESC required. In George, it was “undisputed that, in a properly functioning electrical-distribution system in which the neutral wire is properly grounded, the neutral wire cannot become energized and, thus, one who touches it will not be injured.” 13 So.3d at 360. In short, this ease was not tried on the theory that McCarter was injured by touching the neutral line.
“[I]t is a well-settled rule that parties are restricted to the theory on which a cause is prosecuted or defended in the court below. Where both parties adopt a particular theory they will not be permitted to depart therefrom when the case is brought up for appellate review.” Inter-Ocean Ins. Co. v. Banks, 268 Ala. 25, 27, 104 So.2d 836, 837 (1958).
Additionally, the jury in this case was not instructed on the doctrine of res ipsa loquitur, no evidence was presented on which such an instruction could have been predicated, and McCarter has not undertaken to challenge the manner in which the jury was instructed. It is a familiar principle that “[u]nchallenged jury instructions become the law of the case,” and “[t]he jury is bound to follow such instructions, even if they are erroneous.” Clark v. Black, 630 So.2d 1012, 1017 (Ala.1993). Additionally, “juries are presumed to have followed the trial court’s instructions.” Ex parte Loggins, 771 So.2d 1093, 1108 (Ala.2000). Thus, as instructed in this case, the jury could not have based its verdict on the application of the doctrine of res ipsa loquitur, and it cannot be presumed that it did so. The doctrine of res ipsa loquitur does not apply to relieve McCarter of the burden of proving notice.

*167
III. Conclusion

In conclusion, McCarter failed to present substantial evidence that Black Warri- or had constructive knowledge of the alleged defect in its lines before the time of the accident. The trial court erred, therefore, in denying Black Warrior’s motion for a JML. The judgment is reversed and the case is remanded for the entry of an order consistent with this opinion.
REVERSED AND REMANDED.
MALONE, C.J., and BOLIN, MURDOCK, and MAIN, JJ., concur.

. McCarter concedes that Black Warrior did not have actual notice of any defect.

. The power line was approximately 25' above the ground. 507 So.2d at 1296.